UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAYDEN DEBEVEC,<br><br>Defendant. | 4:23-CR-40033-KES<br><br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Jayden Debevec is before the court on an indictment charging him with attempted enticement of a minor using the internet.  See Docket No. 15.  Mr. Debevec has filed a motion to suppress certain evidence.  See Docket No. 42.  The United States ("government") resists the motion.  See Docket No. 48.  The matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and DSD LR 57.11 (Crim.).

## FACTS

### A.    Arrest and Seizure of Mr. Debevec's Cell Phone

An evidentiary hearing was held on June 11, 2024.  Mr. Debevec was there in person along with his lawyer, Assistant Federal Public Defender Amanda Kippley.  The government was represented by its Assistant United

States Attorney, Jeff Clapper.  Four witnesses testified and 18 exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

On March 5, 2023, Mr. Debevec was taken into custody and charged with attempted enticement of a minor using the internet (18 U.S.C. § 2422(b)) as part of a sting operation by Homeland Security Investigations ("HSI").  Docket No. 1.  HSI Special Agent Andrew Jacob ("SA Jacob") testified that HSI Special Agent Richie Burger ("SA Burger"), posing as a 15-year-old female named "Zoee" on MeetMe, a chat application, communicated with Mr. Debevec.  Phone numbers were exchanged between SA Burger as Zoee, and Mr. Debevec.  The two communicated by phone text message between March 4 and March 5, and on March 5, agreed to meet at Cherry Rock Park in Sioux Falls.  Upon arriving at Cherry Rock Park, law enforcement stopped Mr. Debevec's vehicle before he exited the lot.[1]

Body and dash camera stills captured images of Mr. Debevec's vehicle exterior, and Mr. Debevec's phone inside his vehicle.  Exs. 5-9.  SA Jacob testified that HSI sent a test text message to Mr. Debevec's phone to verify that phone number and device located in Mr. Debevec's vehicle were the same phone number and device used to communicate with the undercover agent posing as Zoee.  That test text message was received by Mr. Debevec's phone.

---

[1] There was no admitted evidence of the interaction between Mr. Debevec and law enforcement at Cherry Rock Park.  Video and audio of Mr. Debevec's pre-polygraph, polygraph, and post-polygraph interviews at the HSI office in Sioux Falls were admitted.  See Exs. 1 & 2.

Ex. 9.  Special Agent Joshua Hauck ("SA Hauck") testified that Mr. Debevec's phone was seized, placed into airplane mode as is standard practice, and tagged as evidence at the scene.  Mr. Debevec was arrested and taken to the HSI office.  Docket No. 43 at pp. 1-2.

**B.      Pre-Polygraph Interview**

The recorded pre-polygraph interview with HSI began at Ex. 1 at 17:13:30.[2]  Mr. Debevec was offered water and a bathroom break at the beginning of the interview.  Id.  SA Jacob and Berger introduced themselves. Id.  During the first several minutes of the interview, Mr. Debevec and the agents discussed non-case topics like the weather and Mr. Debevec's employment.  Id. at 17:13-17.  Mr. Debevec shared that he had been interviewed by federal law enforcement before on an unrelated matter.  Id.  SA Jacob read Mr. Debevec his Miranda[3] rights.  Id. at 17:18:24; Tr. at 8:12-20. Mr. Debevec stated he understood and waived his rights and agreed to talk with the agents.  Ex. 1 at 17:18:49; Tr. at 8:21-26.

Mr. Debevec also agreed to allow the agents to access his phone to discuss the text messages exchanged with the undercover agent.  Ex. 1 at

---

[2] The government acknowledged at the hearing that the time stamp on the video is incorrect.  Mr. Debevec was arrested at 17:22 on March 5, 2023.  See Docket No. 43, p. 2 n.1.  For consistency, this court will use the time stamp indicated on the video but acknowledges that the time stamp does not reflect the actual time of day.  However, the time elapsed on the video is accurate.

The government provided this court with a transcript of the video recording. The transcript was not admitted into evidence.  The court will primarily cite to the admitted video with occasional parallel citations to the transcript.

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

17:20:02; Tr. at 10:4-7.  He then gave the agents his phone passcode and phone number.  Ex. 1 at 17:20:06-20:34; Tr. at 10:10-26.

SA Jacob questioned Mr. Debevec for approximately an hour and a half regarding the text message conversation between Mr. Debevec and Zoee.  Ex. 1 at 17:13:30-18:35:08.  The agents did not offer Mr. Debevec any breaks during the interview.  See pre-polygraph interview transcript.  SA Jacob mentioned the possibility of a polygraph while questioning Mr. Debevec.  Ex. 1 at 18:03:57.  SA Berger supplied Mr. Debevec with water during the interview.  Id. at 18:13:52.  Mr. Debevec stated he wanted to talk with his director (i.e. his boss), his wife, and coordinate transport of his vehicle from the park.  Id. at 18:30:41.  SA Jacob responded, "[t]alking to your wife, talking to the director, handling the car, I will have you make calls.  That's no problem.  (Mr. Debevec - "Okay.")  But after we're done here, you're probably going to jail."  Id. at 18:31:08; Tr. at 84:16-24.  Mr. Debevec did not admit his intention to have sex with Zoee during the pre-polygraph interview.  Ex. 1 at 18:34:07; Tr. at 88:7-9.

At the close of the interview SA Jacob asked if Mr. Debevec had taken any pills that day or any drugs. Ex. 1 at 18:34:11.

Debevec: Oh no, no no. I have-

SA Jacob: Just asking that.  Are you on any medication?

Debevec: Yes I am.  I have medication I do need to take.

SA Jacob: What is it?

Debevec: Ravaprisol[4] [sic].  I have to take it twice a day.  It's for my stomach ulcers.

SA Jacob: Okay.

SA Berger: Okay.

SA Jacob: But uh, you have done any drugs?

Debevec: No. No. No.

SA Burger: You're you're sober minded, all that stuff?

Debevec: To my knowledge. I mean I have the long COVID symptom. Other than that, that's about it.

SA Jacob: And we've treated you with respect this entire conversation?

Debevec: I feel like it.

SA Burger: Okay.  Are you under the influence of anything that may have caused you poor judgment to answer our questions clearly?

---

[4] Rabeprazole Sodium, marketed as ACIPHEX, is for treating ulcers.  *ACIPHEX (rabeprazole sodium) Label*, U.S. Food & Drug Admin., https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwijvavhuNuGAxVKEWIAHV8GC14QFnoECCwQAQ&url=https%3A%2F%2Fwww.accessdata.fda.gov%2Fdrugsatfda_docs%2Flabel%2F2014%2F020973s035204736s005lbl.pdf&usg=AOvVaw35Y-ZI0_QW3WzZ8F0RCCqI&opi=89978449 (last visited June 14, 2024).  Rule 201(b)(2) of the Federal Rules of Evidence allows the court to take judicial notice of facts not subject to reasonable dispute because they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  In footnotes 4, 5 and 7, the court takes judicial notice of the correct spelling of the drugs Mr. Debevec made reference to and what they are generally prescribed for pursuant to FRE 201.  If either party objects to the court taking such judicial notice, they may be heard by seeking a hearing before this magistrate judge and any objections can be made and discussed at such a hearing.

Debevec: [Sigh and pause]—other than Sertraline[5], I don't think so. So Sertraline is anti-anxiety. However, it does-it has been messing with me. Um, my work has noticed it as well.

SA Jacob: Sertraline?

Debevec: Mm-hmm. Centraline [sic]. Uh, C-E-R-T- something, I think is what it's called.

Ex. 1 at 18:35:08; Tr. at 88:10–89:15.

Debevec then asked for another bottle of water and SA Jacob and SA Berger left the room. Ex. 1 at 18:35:16. While Debevec was alone in the room his gaze remained down and he audibly took deep breaths. Id. at 18:35:16-40:23. He remained upright, adjusted his sitting position at the table, and fidgeted with his hands. Id.

## C.    Polygraph Examination and Interview

SA Berger returned and provided Mr. Debevec with another bottle of water. Id. at 18:40:26. SA Jacob introduced Polygrapher Special Agent Michael Johnson ("SA Johnson"). Id. at 18:40:39. SA Johnson told Mr. Debevec that he had a concern that Mr. Debevec had had sexual contact with a minor or would in the future. Id. at 18:41:16; Tr. at 91:6-13.

SA Johnson then described the process of the polygraph to Mr. Debevec. Ex. 1 at 18:41:30; Tr. at 91:15–92:4.

Johnson: Does that [the polygraph] sound like something you can do?

---

[5] Sertraline, marketed as Zoloft, is defined by the U.S. Food & Drug Administration as a selective serotonin reuptake inhibitor used to treat depression, anxiety, and other mood disorders. *Sertraline (marketed as Zoloft) Information*, U.S. Food & Drug Admin., https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/sertraline-marketed-zoloft-information. (last visited June 14, 2024).

Debevec: [Sigh], Is-do I need to take the polygraph?

Johnson: Uh, I think so.  Because there's uh-here's-here's the thing Jayden.  Um, with a case like yours, um [sigh] there are a lot of unanswered questions, right?  Uh, we don't know anything about you other than just this snapshot of what we've seen today, all right?

Debevec: Okay.

Ex. 1 at 18:42:16-35; Tr. at 92:3-12

SA Johnson again brought up consent to the polygraph before offering Mr. Debevec a bathroom break.  Ex. 1 at 18:44:06.  Mr. Debevec did not verbally decline the polygraph.  Id. at 18:44:30; see Tr. at 93:22–95:26.  He was affirmative in all his responses as to taking the polygraph.  Id.  After SA Johnson left the room to set up the polygraph, SA Jacob offered Mr. Debevec a bathroom break which Mr. Debevec declined.  Id.

Mr. Debevec was left in the room alone for approximately 17 minutes.  Ex. 1 at 18:45:07–19:02:18.  During this time, Mr. Debevec leaned back in his chair, stretched, leaned forward, fidgeted with his hands, and audibly took deep breaths.  At one point, Mr. Debevec got up from his chair and stretched against the wall and table stating, "oh, f**k my back."  Id. at 18:59:55.  SA Jacob returned and again offered a bathroom break which Mr. Debevec again declined.  Id. at 19:02:29.  SA Jacob and Mr. Debevec left the room and headed to the polygraph examination room.  Id. at 19:02:50.

The recorded polygraph interview with HSI begins in Ex. 2 at 19:03:40.  SA Johnson discussed the polygraph consent form and re-Mirandizing Mr. Debevec.  Id. at 19:05:43.  Mr. Debevec was encouraged to ask questions

7

about the polygraph process.  Id. at 19:06:09.  Mr. Debevec asked if the test could be paused so he could bend and move because of his back pain.  Id. at 19:06:37.  SA Johnson responded that Mr. Debevec had sat in the other interview room for quite a while.  Id.  SA Johnson informed Mr. Debevec that he would need to sit still for 5-7 minutes at a time.  Id. at 19:07:00.  He told Mr. Debevec that at any time if he was uncomfortable or needed to stand, that he should inform SA Johnson.  Id. at 19:07:10.  He assured Mr. Debevec there would be opportunities for him to move around in between the tests.  Id. at 19:07:23.

SA Johnson read Mr. Debevec his Miranda rights.  Id. at 19:07:53; Tr. at 5:9–6:6.  SA Johnson asked Mr. Debevec if he understood his rights.  Id. at 19:08:50.  Mr. Debevec responded, "Yeah."  Id.; Tr. at 6:7.  SA Johnson provided Mr. Debevec with the Miranda waiver form, instructed that if he consented, to initial each part of the form, and sign and date the bottom.  Ex. 1 at 19:09:36; see Ex. 4.  Mr. Debevec completed the form.[6]  Id.  SA Johnson corrected the spelling of Mr. Debevec's name.  Ex. 1 at 19:10:40; see Ex. 4.

SA Johnson then presented Mr. Debevec with the consent to polygraph form.  Ex. 1 at 19:10:50; see Ex. 3.  Mr. Debevec began to read the form out loud.  Ex. 1 at 19:11:00.  Mr. Debevec paused when he read the statement, "I represent that I am in good health and know of no mental or physical problems that would impair my ability to submit to a polygraph examination."  Ex. 1 at

---

[6] At the hearing, SA Jacob acknowledged that the audio/video recorded date of January 30, 2023, on the form was incorrect, but that the date of the examination, March 5, 2023, was correct.

19:12:00.  He asked SA Johnson if his medications should be considered under

the provision.

> Debevec: Does sertraline count or gabapentin out of that because when
> those two mix it screws with me . . . those two mixed together does not
> bode well for me before.

> SA Johnson: Tell me what you mean by it doesn't bode well for
> you-

> Debevec: it clouds, it clouds my brain.

> SA Johnson: What do you mean by clouds your brain?

> Debevec: It makes it harder to think, makes it harder to make it to
> where I could have consistent thoughts.

> SA Johnson: What do you mean by consistent thoughts?

> Debevec: By consistent thoughts, I mean being able to I guess hold
> a, hold a proper conversation, having that I don't really know how
> to explain it to you. Cognitivity, I guess.

> SA Johnson: Are you under any type of medical guardianship
> because of being on those medications.

> Debevec: No

> SA Johnson: Are you able to hold a job?

> Debevec: Yes

> SA Johnson: Did you understand the conversation you had with
> those agents earlier?

> Debevec: No, not a hundred percent.

> SA Johnson: Tell me what you didn't understand about that
> conversation.

> Debevec: I guess I don't know how to explain it to you. I mean I
> understand they were doing their job and everything.  But I guess I
> didn't understand why they were trying to use my own words
> against me.

9

SA Johnson: Yeah. So, that's a procedural interview technique, and it seems like you understood what they were trying to do because you just explained it to me.

Debevec: So, it was a hostile interrogation.

SA Johnson: Why are you, why are you in that hostile interrogation? Well, let me tell you that's a lot different than what you had. What are you in this room to do right now?

Debevec: I am here to take a polygraph test.

SA Johnson. Okay. Did we just read your rights?

Debevec: Yes.

SA Johnson: Yeah. I think you're good to take this test.

Debevec: Okay. Cool.

SA Johnson: If at any point there's anything you don't understand, you need to stop me and make sure that you understand. As long as you do that, and as long as you're, you're cognitively aware enough to do that, I feel good about it.

Ex. 2 at 19:12:21-13:58; Tr. at 8:18–11:3.

Mr. Debevec continued to read the consent form out loud at the direction of SA Johnson. Ex. 2 at 19:14:14. Mr. Debevec was engaged with the form and asked clarifying questions. Id. at 19:16:10. He stated he reread the form before checking next to each provision. Id. He then corrected his birthday and signed his name at the bottom. Id. at 19:17:00; see Ex. 3. SA Johnson allowed Mr. Debevec to contact his wife prior to the polygraph, which SA Johnson said was not his normal practice. Ex. 2 at 19:20:10.

In discussing Mr. Debevec's health status, Mr. Debevec disclosed that he was currently seeing a doctor at Falls Community Health for stroke-like symptoms. Id. at 19:24:14; Tr. at 20:5-23. Mr. Debevec reiterated that he was

on Sertraline for anxiety and added that he was on Gabapentin[7] for neuropathy.  Tr. at 20:17-20.  Mr. Debevec stated that he feels tingling in his body and identified it as a significant symptom.  Ex. 2 at 19:24.  Mr. Debevec also disclosed that he had previous heart problems but was not currently taking prescription medication for the issue.  Id. at 19:26:46.

SA Johnson asked if Mr. Debevec's burning sensation in his chest was stress related, and Mr. Debevec stated he thought it was.  Id. at 19:27:16.  SA Johnson told Mr. Debevec that if he felt anything that was not normal, to let him know.  Id. at 19:27:27.  Mr. Debevec reported no blood pressure or breathing problems.  Id. at 19:27:32.  Mr. Debevec thought he had had rectal surgery; SA Johnson interpreted what Mr. Debevec described as a colonoscopy.  Id. at 19:28:30.  Mr. Debevec stated that in the last 24 hours he had consumed alcohol but was not currently under the influence.  Id. at 19:29:07.  Other than noting his back, Mr. Debevec stated he was not in any other pain or discomfort.  Id. at 19:29:49.  Again, Mr. Debevec was directed to report any pain or discomfort.

When asked how many hours Mr. Debevec slept the night before, he reported he had slept 2 hours.  Id. at 19:30:16.  He also stated he had not

---

[7] Gabapentin, marketed as NEURONTIN, is used for treating neuralgia and epilepsy.  *NEURONTIN (gabapentin) Label*, U.S. Food & Drug Admin., https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwjT4vnK5tuGAxUFD1kFHWGkBnMQFnoECAYQAQ&url=https%3A%2F%2Fwww.accessdata.fda.gov%2Fdrugsatfda_docs%2Flabel%2F2017%2F020235s064_020882s047_021129s046lbl.pdf&usg=AOvVaw2pr_WPoskTRx4ElMlUvAwC&opi=89978449 (last visited June 14, 2024).

eaten anything since yesterday morning and that was not normal for him.  Id.

at 19:30:58.  SA Johnson made the determination that Mr. Debevec was fit to

take the polygraph test.  Id. at 19:33:45.  Mr. Debevec responded that he would

"like to try," and understood that he could stop anytime.  Id. at 19:34:00.  Mr.

Debevec was then escorted to the bathroom.  Id. at 19:34:25.

SA Johnson began the polygraph interview by questioning Mr. Debevec

on his family and sexual history.  Id. at 19:37:06.  SA Johnson explained the

parameters of the test to be sexual encounters Mr. Debevec had when he was

aged 18 to present day and to not include incidents before that time.  Id. at

20:02:04.  Mr. Debevec disclosed that when he worked at Pizza Hut, he invited

a girl over to his house and did not know whether she was 18 years of age.  Id.

at 20:02:21.  SA Johnson addressed Mr. Debevec's comment:

> SA Johnson: So we're going to talk about age-appropriate
> relationships.
>
> Debevec: Okay.
>
> SA Johnson: So, you know, not much over 20.
>
> Debevec: Mm-hmm.
>
> SA Johnson: But a 19-year-old and a 16-year-old, those are age-
> similar relationships.  Those would be definitely violations of
> maybe house rules.  Maybe somebody's house wouldn't like it, but
> it's not a violation of the law, and it doesn't, rise to that level of
> sexual contact that two are going to talk about when we talk later.
> . . . if you were 25 working at Pizza Hut and she was 16, we'd we'd
> want to talk about that. All right?
>
> Debevec: I understand.
>
> SA Johnson: Or, or certainly under the age of 16 because most
> state('s) says 16 is the age of consent, and it would be a
> permissible, relationship.

Id. at 20:03:02; Tr. at 58:9–59:7.

SA Johnson told Mr. Debevec that he had observed his interview with SA Jacob and SA Berger.  Ex. 2 at 20:05:05.  He stated, "the games you played with those guys (Jacob and Berger) that have not done this as much, they're not going to work here."  Id.; Tr. at 60:23-25.  SA Johnson encouraged Mr. Debevec to be 100% honest.  Ex. 2 at 20:05:35.  Mr. Debevec then took another bathroom break.  Id. at 20:05:45.

After the break, approximately three hours into interviewing Mr. Debevec, SA Johnson described to Mr. Debevec in detail how the polygraph would be administered.  Id. at 20:09:55.  Mr. Debevec explained to SA Johnson that he has a "consistent twitch" and heart murmurs.  Id. at 20:10:31.  SA Johnson stated he was not concerned that Mr. Debevec's "normal" with heart murmurs, Mr. Debevec's back, or his medications would affect the polygraph. Id. at 20:10:55.

SA described the contents of the questions of the polygraph including questions related to the incident, "about sexual contact with a child since the age of 18."  Id. at 20:14:11; Tr. at 66:9-13.  At that time, SA Johnson did not define the age parameters of what constituted a "child" or "minor" prior to questioning Mr. Debevec.

> SA Johnson: Since the age of 18, have you had any sexual contact
> with a minor?
>
> Debevec: Oh, we'll go right now?
>
> SA Johnson: Yeah, I'm just asking.

13

Debevec: Oh, okay. No.

SA Johnson: Okay. All right.

Id. at 20:15:55; Tr. at 67:22–68:2.

SA Johnson went on to explain to Mr. Debevec what he meant by sexual contact. Ex. 2 at 20:16:00. Mr. Debevec yawned during the explanation. Id. at 20:17:01. SA Johnson then stated, "[w]hat I would not be talking about is, those age-appropriate relationships, the 18-year-old and the 16-year-old, the 19-year-old. When they are part of your peer group. And by peer group, I mean peer group by age. I don't mean a 28-year-old working in the same building with a 16-year-old." Id. at 20:17:22; Tr. at 69:12-17. He did not define what a "child" or "minor" was. SA Johnson reiterated that "age-similar peer group" relationships is not what he was concerned about during questioning. Ex. 2 at 20:19:12.

Mr. Debevec yawned again just before SA Johnson stated the polygraph questions. Id. at 20:19:30. SA Johnson did not acknowledge Mr. Debevec's tiredness. Id. The two proposed polygraph questions related to sexual contact were (1) Since the age of 18, have you had any sexual contact with a minor? and (2) since the age of 18, have you had any sexual contact with a minor in any way? Id. at 20:19:39; Tr. at 71:2-10. SA Johnson asked Mr. Debevec if he had any concern with the questions and Mr. Debevec responded, "No." Ex. 2 at 20:19:45.

SA Johnson confronted Mr. Debevec when he asked him whether he had ever lied to make himself look important. Ex. 2 at 20:20:29; Tr. at 72:3-6. Mr.

14

Debevec disclosed that he had not for his current job but yes in previous jobs.

Id. at 20:20:45; Tr. at 72:10-11.

> SA Johnson: You're manipulating people.  You're that guy.  You're
> out there manipulating your environment for your betterment.
> You're out there-
>
> Debevec: I guess I don't think of it that way.  I guess maybe I
> would-
>
> SA Johnson: Because if that's the case, if you're that guy, I've got
> to change what I'm doing because, [Mr. Debevec audibly laughs]
> hey, hey, I don't know why you're laughing.
>
> Debevec: Because I believe the way you're explaining it, I
> misunderstood.

Ex. 2 at 20:20:48; Tr. at 72:15-24.

Before SA Johnson conducted the polygraph, he asked Mr. Debevec if there was anything he didn't understand about any of the questions, focusing specially on whether Mr. Debevec was "clear on sexual contact."  Ex. 2 at 20:22:41; Tr. at 75:6-8.  Mr. Debevec stated, "Yes," that he understood.  Tr. at 75:10.  Mr. Debevec stated he did have a question, but that he "didn't remember what it was."  Ex. 2 at 20:22:50.  SA Johnson encouraged Mr. Debevec to stop him and ask his question if he remembered.  Id.

SA Johnson offered Mr. Debevec a bathroom break before initiating a practice test.  Id. at 20:23:01.  While attaching the cardio cuff, SA Johnson asked Mr. Debevec if he was comfortable, at least as comfortable as he could be.  Id. at 20:26:43.  Mr. Debevec confirmed he was and adjusted his feet.  Id. at 20:26:45.  He told SA Johnson that he was having issues keeping his feet

planted because of his hip. Id. at 20:29:36. SA Johnson determined that his positioning was fine. Id.

During the practice test, Mr. Debevec closed his eyes and was admonished by SA Johnson to keep them open. Id. at 20:33:42. Mr. Debevec told SA Johnson that his arm was going numb. Id. at 20:34:22. SA Johnson's response was, "no talking other than answering the questions." Id. at 20:34:25. Mr. Debevec can be seen squeezing his hand repeatedly after the cuff was deflated. Id. After the practice polygraph, SA Johnson stated, "[g]ood job following my instructions. You need to keep your eyes open. That's the procedures." Id. at 20:34:56. Mr. Debevec responded, "I am so sorry about that. I am about to-."[8]

Mr. Debevec told SA Johnson that the feeling of the cardio cuff was similar to what he experienced after COVID. Id. at 20:36:19. SA Johnson responded that the cardio cuff was not going to give him COVID and assured Mr. Debevec that the cuff was not going to harm him. Id. at 20:36:41. SA Johnson then went over the questions for the actual polygraph. Id. at 20:37:08. No further explanation about defining the term "minor" was provided. Id. SA Johnson adjusted the arm pad to accommodate Mr. Debevec's discomfort. Id. at 20:38:07.

_____

[8] SA Johnson begins to talk over Mr. Debevec's explanation. The transcript text is as follows, "I am so sorry about that. I am about to (unint.)." Tr. at 84:20-21. This court observes that Mr. Debevec is responding to SA Johnson's statement about keeping his eyes open and that it sounds like Mr. Debevec is saying, "I am so sorry about that. I am about to fall asleep."

SA Johnson administered the polygraph test 4 times, resulting in 6 charts.[9]  Id. at 20:40:26, 20:49:20, 20:56:06, 21:03:58 (continuation of fourth test at 21:08:19).  After the first test, Mr. Debevec reported that he was concerned that his hand was changing colors from the cardio cuff.  Id. at 20:44:38.  SA Johnson replied that he did not have concerns about Mr. Debevec's hand and asked if Mr. Debevec wanted to continue with the testing.  Id. at 20:45:16.  Mr. Debevec agreed to continue but asked for a couple of minutes of rest.  Id. at 20:45:49.  SA Johnson told Mr. Debevec that he had never received similar complaints about the cardio cuff.  Id.

SA Johnson stated, "[t]his is the way the test is run.  If you're [Debevec] interested in having a conversation with me and clearing this up, I'll continue with the test.  But if you're trying to manipulate like you did those gentlemen that you were talking to earlier, wrong room.  Am I being fairly clear?" SA Johnson continued, "[i]t doesn't feel good.  But it doesn't hurt."  Id. at 20:46:25.  Mr. Debevec acknowledged what SA Johnson was saying.  Id. at 20:46:48.  Mr. Debevec was able to shift his feet and move around in his chair.  Id. at 20:47:29.  Prior to the second test, SA Johnson told Mr. Debevec, "if we're going to be doing this, it's just something you got to suck up for a little bit."  Id. at 20:48:09.

SA Johnson did reduce the pressure on the cuff for the second test.  Id. at 20:49:20.  Mr. Debevec stated that the cuff pressure was better.  Id. at 20:53:22.  He reiterated that he had a twitch and stated to SA Johnson he was

---

[9] Phillip Toft testified that he reviewed 6 polygraph charts.

doing everything he could.  Id. at 20:53:52.  Mr. Debevec rolled his head and adjusted his body position in the chair after the second test.  Id. at 20:54:58. Mr. Debevec did not make any statements between the third and fourth tests. Id. at 21:02:21.

During the fourth test, Mr. Debevec asked if he was doing something wrong to necessitate the pausing of the test.  Id. at 21:05:52.  SA Johnson stated that he needed Mr. Debevec to be as still as possible.  Id.  Mr. Debevec adjusted himself in his chair and yawned.  Id. at 21:06:58.  SA Johnson wanted to run one more chart before taking a break.  Id.  Mr. Debevec apologized to SA Johnson, stating, "I'm tired, I'm doing everything I can to stay awake."  Id. at 21:07:03.  SA Johnson responded stating, "Yeah, well that's surprising because this is a pretty stressful event in your life.  I can't imagine that you can't find the ability to stay awake and pay attention."  Id. at 21:07:15.  He then immediately began to readminister the fourth test.  Id. at 21:07:43.  SA Johnson admonished Mr. Debevec to stay engaged.  Id.

Once the test had concluded, SA Johnson removed the polygraph components and Mr. Debevec was able to get up out of the chair but was told to stay in that area of the room.  Id. at 21:12:50.  Mr. Debevec yawned as he stretched.  Id. at 21:13:01.  After ten minutes, Mr. Debevec asked to go to the bathroom.  Id. at 21:23:28.  He left the room with SA Johnson.  Id.

**D.    Post-Polygraph Interview**

The post-polygraph interview began at 21:36:36.  See Ex. 2.  SA Johnson told Mr. Debevec that he had failed the polygraph "because you have had

18

sexual contact with a child." Id.  Mr. Debevec responded, "I don't-" but SA

Johnson interrupted and told Mr. Debevec that he would be charged with a

serious crime.  Id. at 21:36:45.

> SA Johnson: the best way to demonstrate that [accountability] before the decision makers ever meet you is for you and I to come forward after this test and I'm able to tell them you were a hundred percent honest with me.
>
> Debevec: Okay.
>
> SA Johnson: All right?  The failed test will mean nothing as far as a black mark as long as I'm able to explain it. [...]
>
> Debevec: Okay. . . . So when we were talking about it, there was my concern about that girl at Pizza hut.
>
> SA Johnson: Yeah.
>
> Debevec: I was – I, I was thinking on it more and more.  I was concerned that she was not 18.
>
> SA Johnson: Okay.  You knew she wasn't.  I need you to, I need you to be honest with me so we can talk about that.
>
> Debevec: Yes, yes, you are correct.  She was not.
>
> SA Johnson: Okay, how old was she? [...]
>
> Debevec: She was 16. [...]
>
> SA Johnson: I told you specifically age of 16 is the age of consent. That is not what we are talking about.  That is not the question. That is not the problem. [...] If that girl was 14 years old and you know that, that would be something [...] Was she under the age of 16?
>
> Debevec: No, she was not.

Id. at 21:39:51-42:33; Tr. at 105:20–108:13.

After approximately 6 minutes of SA Johnson asking Mr. Debevec to have a "one hundred percent honest" conversation with him, Mr. Debevec agreed. Ex. 2 at 21:48:18.

> SA Johnson: Was it your intention to day to have sex with a 15-year-old girl if the circumstances would have been that she would have been there?
>
> Debevec: Yes.
>
> SA Johnson: That is true?
>
> Debevec: Yes.
>
> SA Johnson: You are being truthful about that now?
>
> Debevec: Yes.

Id. at 21:48:23-49:14; Tr. at 113:1-10.

Mr. Debevec denied having any other sexual conversations with a minor as SA Johnson now defined as under the age of 16, Tr. at 117:5-9, denied having any pictures or videos of any person under the age of 18 in a nude or sexual state, Tr. at 118:13-18, and denied that he had had inappropriate sexual contact with a minor. Id. at 119:14-23.

> SA Johnson: Your intention, all things considered today, was to have sex with a 15-year-old girl and that's why you drove to that park.
>
> Debevec: Yes, and I am ashamed to admit it.

Id. at 21:57:04; Tr. at 120:13-16.

When SA Johnson returned to the interview room, Mr. Debevec continued to deny sexual contact or sexual conversations with any others under the age of 16. Ex. 2 at 22:04:17. SA Johnson asked Mr. Debevec how he felt he was treated. Id. at 22:05:19. Mr. Debevec responded that he

thought SA Johnson knew his job very well.  Id.  SA Johnson asked Mr.

Debevec if he ever had another polygraph, would he mind if SA Johnson was

the examiner.  Id. at 22:07:38.  Mr. Debevec responded that he would be okay

with that.  Id.

SA Johnson stated, "I don't ever want to treat anyone any different than

I'd want to be treated.  It's just, sometimes, sometimes it takes a little, a little, a

little tough talk to make sure everybody's paying attention and on the right

page and things like that."  Id. at 22:07:56.  Mr. Debevec was provided with

water.  Id. at 22:08:30.  The recording ended at 22:15:09 when Mr. Debevec

was escorted out of the room.  The total interrogation length including

polygraph testing was approximately 5 hours.

**E.    The Search Warrant**

SA Jacob applied for a search warrant of Mr. Debevec's phone on March

15, 2023.  Ex. 17.  Attachment A of the warrant listed the location to be

searched as: "Jayden Debevec's Samsung phone with the phone number of

307-258-1086 with pass code of 1995, that is currently in the custody of . . .

Homeland Security."  Ex. 16 at p. 4.  Attachment B listed the items to be seized

as "[a]ll records on the devices described in Attachment A, from January 1,

2023, to the present, that relate to violations of violations of 18 U.S.C.

2422(b)."  Id. at p. 5.  Paragraph 8 of Attachment B authorized the fingerprints

of "Kent Mews" to be used to access the contents of the phone.  Id. at p. 6.

Similarly, SA Jacob referenced a Samsung phone in his supporting affidavit.

Ex. 17 at p. 2.  The warrant, issued on March 15, 2023, commanded execution

on or before March 29, 2023.  Ex. 16 at p. 1.

**F.    Hearing Testimony**

    **1.    SA Jacob**

SA Jacob testified that he was the lead investigator on Mr. Debevec's

case.  He began his employment with HSI in 2020.  SA Jacob conducted

Mr. Debevec's initial interview once he arrived at HSI the night of his arrest.

SA Jacob affirmed that Mr. Debevec had disclosed the use of various

medications.  SA Jacob testified that he did not witness Mr. Debevec being

impaired and did not observe any clues as to Mr. Debevec's compromised

capacity or comprehension during the interviews or polygraph.

SA Jacob admitted to witnessing Mr. Debevec yawn but did not recall

him having difficulty trying to stay awake.  SA Jacob stated that he did not

clarify the age of consent with Mr. Debevec during the first interview nor define

the term "minor."  See Tr. at 57:4-12.

SA Jacob testified that Mr. Debevec's seized cell phone was not a

Samsung phone, but rather a Motorola phone.  Mr. Debevec's phone number

307-258-1086 and pass code 1995 for this Motorola phone as listed in the

search warrant were accurate.  SA Jacob testified that Kent Mews was not

associated in any way with Mr. Debevec's case and admitted that the reference

to Kent Mews in Attachment B to the search warrant was mistaken.

As to the scope of the warrant, SA Jacob testified that he received the

Cellebrite reader files from SA Hauck, which contained the entire contents of

Mr. Debevec's phone.  He testified that he examined only that part of the contents of the phone from to January 1, 2023, to the present (March 2023) as directed by the search warrant.  SA Jacob stated he uses filters to limit the date ranges of the types of content on the phone to be in compliance with the search warrant.  The government and SA Jacob provided the court with a demonstration of how the filters are applied within the Cellebrite reader program using Mr. Debevec's actual file.  Ex. 12 (Cellebrite home screen).

The home screen contains information about the make and model of the phone and the phone number.  Id.  Before the filter is applied, the Cellebrite reader displays thumbnail images of all the content (texts, images, and videos) contained in the file.  Exs. 13-15.  Only after an investigator selects the appropriate filters are the contents limited.  Id.  SA Jacob testified that he does not include a description of the filter procedure in his reports.  He also testified that there is a tool to tag and save certain data but that he utilizes the available filters.

### 2. SA Hauck

Special Agent Joshua Hauck works as a criminal and forensic analyst for HSI.  See Ex. 10 (Hauck CV).  He has been with HSI since 2022 and has worked with Cellebrite software since 2014.  Id.  SA Hauck testified to the procedure for data extraction of an electronic device such as the cell phone in Mr. Debevec's case.  He stated that when he receives a device, it is in a sealed evidence bag with a tracking number.  SA Hauck testified that it is standard procedure to place the phone in airplane mode and plug it into a power source

until a search warrant is secured.  SA Hauck testified that he received

Mr. Debevec's phone per this procedure, and it was in airplane mode.

SA Hauck testified that at the first step of extraction, the analysts use a

program called Graykey.  Graykey does not have the capability of limiting the

content download to the date range specified in the search warrant.  Graykey

downloads the entire contents of the digital device.  It is SA Hauck's and the

Sioux Falls HSI office's practice to load the entire contents collected by Graykey

into the Cellebrite reader and provide the "UFED report" to investigators.  There

is no targeted extraction at this second step; however, the filters are available

within the Cellebrite program to limit the contents to the parameters of the

search warrant.

SA Hauck testified that he leaves the process of limiting the content of

the search to the investigators working on the case at step 3.  Rather than

relying on a 3rd party with limited knowledge of the case to limit the data, SA

Hauck testified that the HSI office relies on internal controls.  However, HSI

has no written policy or procedure detailing the limiting of the data per the

search warrant.

SA Hauck testified that while filters are available to limit what

investigators receive in the UFED report, there is a risk of losing data.  He gave

an example of a text message conversation that begins prior to the start of the

search warrant date range.  The whole of that conversation may not appear if

the date range is limited to that specified in the search warrant.  SA Hauck and

the government attorney stated that when they included an exclusive date
range, some data within the scope of the search warrant did not appear.

SA Hauck also testified that it is often the defense attorneys that request
all the raw data from the device. SA Hauck testified that he does not verify the
make and model of the phone as to the search warrant because the evidence
procedure ensures that the phone from the scene is the phone being searched.
He also does not review the search warrant in its entirety. He reviews the
information relevant to the extraction, such as the execution date.

### 3. SA Craig Scherer

Special Agent Craig Scherer testified as to the standard practice at the
Sioux Falls HSI office of not limiting data extraction. He stated that this
practice is common with other agents in other jurisdictions and with state
investigators. SA Craig Scherer stated that data outside of the scope of the
warrant can provide exculpatory information that may trigger another search
warrant application. He agreed with SA Hauck that there was no written policy
regarding limiting extraction of the data to the parameters of the search
warrant.

### 4. Phillip Toft, Private Polygraph Examiner/Investigator

Mr. Phillip Toft has been a polygraph examiner for 24 years. Ex. A. at
p. 2. He is with Great Plains Credibility Services LLC. Id. Mr. Toft was hired
by Mr. Debevec's counsel to conduct a review of Mr. Debevec's polygraph
examination for quality control. Mr. Toft reviewed the video of Mr. Debevec's
interviews, the video of his polygraph exams, and the polygraph charts.

Mr. Toft testified that there are three categories of polygraph participants: suitable, marginally suitable, and unsuitable. Mr. Toft agreed with SA Johnson's determination that Mr. Debevec was marginally suitable to take the polygraph. Mr. Toft explained that a person may be marginally suitable if they are tired, hungry, in pain, or have a mental issue, but can still comprehend questions and engage with the test. The consequence of conducting a polygraph on a marginally suitable person is that the results should be looked at with caution.

Mr. Toft testified that the American Polygraph Association recommends that participants be rested. Participants that have not had adequate sleep who are stressed may have a tougher time staying focused which could impact results. He also testified that medical and mental health conditions can skew a test. He observed that Mr. Debevec was fatigued, was not offered sufficient breaks, and did not seem aware that he could stop the test at any time.

Mr. Toft stated that participants need to completely understand the questions presented. Mr. Toft took issue that "peer relationships" was not adequately defined, and the definition of what constituted a "minor" was not specified. Not defining such terms makes the questions broad enough to encompass anything that happened in the participant's entire life. The more specific the question, the better.

Mr. Toft testified that SA Johnson performed the polygraph correctly. Mr. Toft observed SA Johnson to be "combative" and that an ethical polygraph requires the exchange of freely answered questions. He agreed with

SA Johnson's conclusion that Mr. Debevec's polygraphs indicated that he was deceptive.

Mr. Debevec seeks to suppress his statements given to law enforcement during and after his polygraph examination on the grounds that the statements were involuntary in violation of the Fifth Amendment. Docket No. 42 at p. 1. He also seeks to suppress the fruits of the search of his cell phone on two grounds: (1) the government searched a different cell phone than the one authorized to be searched by the search warrant that was granted and (2) the government's search of that cell phone exceeded the scope of the search as defined by the search warrant. Id.

The government asserts that Mr. Debevec's statements were voluntary and that the search of his cell phone was lawful. Docket No. 48 at pp. 7-13. The government asks the court to deny Mr. Debevec's motion in all respects. Id. at p. 13.

## DISCUSSION

### A. Voluntariness of Mr. Debevec's Statements

The Supreme Court has stated that, under the Due Process Clause of the Fifth and Fourteenth Amendments, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." Miller v. Fenton, 474 U.S. 104, 109 (1985). "In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that

the defendant's will was overborne and his or her capacity for self-determination was critically impaired." United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998) (citation omitted).  The court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." Id. (citation omitted).  The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence.  Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004) (plurality opinion) (citing Lego v. Twomey, 404 U.S. 477, 489 (1972)).

### 1.    **Colorado v. Connelly**

The landmark Supreme Court case on the topic of voluntary confessions is Colorado v. Connelly, 479 U.S. 157 (1986).  In Connelly, defendant Francis Barry Connelly approached a police officer and, without any prompting, stated that he wanted to confess to a murder.  Id. at 160.  The officer immediately advised Connelly of his Miranda rights and asked him if he had been drinking or taking any drugs.  Id.  Connelly denied taking any mind-altering substances but stated that, in the past, he had been a patient in several mental hospitals. Id.

Connelly then spoke to a homicide detective, who again advised him of his Miranda rights.  Id.  Connelly then confessed to the murder of a young girl that he claimed to have committed approximately 9 months earlier, telling the officer the location where the murder took place.  Id.  A check of police records revealed that the body of an unidentified female had been discovered four

months earlier in the location identified by Connelly.  Id. at 160-61.  At no time did the homicide detective who took Connelly's confession observe any indication that Connelly was suffering from any kind of mental illness.  Id. at 161.

The next day, Mr. Connelly became visibly disorientated and was sent to a state hospital for evaluation, where a psychiatrist diagnosed him with chronic schizophrenia manifested through "command hallucinations" that interfered with his ability to make free and rational choices.  Id.  Mr. Connelly stated that the "voice of God" instructed him either to confess to the murder or to commit suicide.  Id.  The psychiatrist confirmed that, although Mr. Connelly's psychosis did not impair his cognitive abilities, that is, he was able to intellectually understand his Miranda rights, his psychosis did motivate his confession.  Id.

Based on this evaluation, the Colorado trial court found that Mr. Connelly's statements were involuntary and should be suppressed even though police had not coerced Mr. Connelly's confession or otherwise overreached.  Id. at 162.  The Colorado trial court held that Mr. Connelly's mental illness both impaired his free will by compelling him to confess and vitiated his attempted Miranda waiver.  Id.  The Colorado Supreme Court affirmed, finding that Mr. Connelly's severe mental illness overbore his rational judgment and free will, making his confession involuntary and negating his ability to make a valid waiver of his rights.  Id.  That court held that "the

29

absence of police coercion or duress [did] not foreclose a finding" that Connelly's statement was nevertheless involuntary.  Id.

The United State Supreme Court reversed, finding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."[10] Id. at 167.  The Court based its decision, in part, on the fact that cases considered by the Court over the 50 years preceding Connelly involving the constitutional privilege against compulsory self-incrimination had all "focused upon the crucial element of police overreaching." Id. at 163 & n.1 (citing Mincey v. Arizona, 437 U.S. 385, 387, 396-402 (1978) (defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 390 U.S. 519, 519-21 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); Beecher v. Alabama, 389 U.S. 35, 36-38 (1967) (police officers held gun to the head of wounded confessant to extract confession); Davis v. North Carolina, 384 U.S. 737, 739-53 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); Reck v. Pate, 367 U.S. 433, 436-44 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); Culombe v. Connecticut, 367 U.S.

---

[10]"Although Connelly arose under the Due Process Clause of the Fourteenth Amendment, whereas the instant case implicates the Fifth Amendment, the analysis in the Connelly decision has been extended to apply to involuntary confession claims arising under the Fifth Amendment as well." United States v. Bad Hand, 926 F. Supp. 892, 899 n.10 (D.S.D. 1996).

568, 569-70, 621-22 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); <u>Payne v. Arkansas</u>, 356 U.S. 560, 561-68 (1958) (defendant held incommunicado for three days with little food; confession obtained when police officers informed defendant that Chief of Police was preparing to admit lynch mob into jail); <u>Ashcraft v. Tennessee</u>, 322 U.S. 143, 153-55 (1944) (defendant questioned by relays of officers for 36 hours without an opportunity for sleep)).

The Court explained that the argument that an involuntary confession violates a defendant's constitutional rights is predicated on the Due Process Clause and that, in other contexts, the Court has always required as part of the *prima facie* showing of a due process violation that there was some sort of *state action*. <u>Id.</u> at 165. Thus, in the context of a claim that a statement was involuntarily wrung from a defendant in violation of the Due Process Clause, the Court concluded that it was congruent with due process precedent that there be established the necessary element of state action--in this context, police coercion or overreaching. <u>Id.</u>

In addition, the Court noted that the purpose of excluding involuntary statements taken in violation of the Due Process Clause is to deter police from violating other persons' constitutional rights in the future. <u>Id.</u> at 166. By applying the exclusionary rule in Connelly's case, in which there had been no police wrongdoing, the Supreme Court concluded that the purpose of the exclusionary rule would not be furthered. <u>Id.</u> The Court pointed out that rules of evidence, not the Constitution, exist to ferret out false or untrustworthy

31

evidence.  Id. at 167.  The Due Process Clause seeks to prevent "fundamental unfairness" in the use of a statement, whether that statement is true or false or otherwise unreliable.  Id. (citing Lisenba v. California, 314 U.S. 219, 236 (1941)).

### 2.    Other Cases

The Connelly Court made clear that the Court's previous decisions in Blackburn v. Alabama, 361 U.S. 199 (1960), and Townsend v. Sain, 372 U.S. 293 (1963) were still good law.  Connelly, 479 U.S. at 164-65.  In Blackburn, a defendant's statement was held to be involuntary where the police learned that the defendant had a history of mental problems and was "probably insane" at the time of his confession.  361 U.S. at 207-08.  However, the evidence in that case was that the police exploited this weakness with coercive tactics by holding the defendant incommunicado for 8 to 9 hours of sustained interrogation in a tiny room which was, on occasion, literally filled with police. Connelly, 479 U.S. at 165 (citing Blackburn, 361 U.S. at 207-08).  It was these coercive tactics, not the defendant's mental condition alone, that served to support the Court's conclusion that the confession had been wrung out of the defendant against his will.  Id. (citing Blackburn, 361 U.S. at 206-07).

Similarly, in the Townsend case, police administered a truth serum to the defendant and then proceeded to wring a confession from him.  Townsend, 372 U.S. at 298-99.  The Connelly Court pointed out that both Blackburn and Townsend supported the Court's holding that "mere examination of the

confessant's state of mind can never conclude the due process inquiry." Connelly, 479 U.S. at 165.

Approximately six weeks after it issued its decision in Connelly, the Supreme Court issued another decision, Colorado v. Spring, 479 U.S. 564 (1987), further explaining what it meant by police "coercion." In that case, a defendant had been told that police wanted to interrogate him about some firearms offenses. Id. at 566-67. The police duly advised Spring of his Miranda rights, which Spring waived. Id. at 567.

Then, during the course of the interrogation, the police questioned Spring about his involvement in a murder. Id. Spring later argued that his waiver of his Miranda rights was "compelled" because he was not told at the inception that he would be questioned about the murder. Id. at 573. The Court rejected this argument, stating that, "[h]is allegation that the police failed to supply him with certain information does not relate to any of the traditional indicia of coercion: 'the duration and conditions of detention . . ., the manifest attitude of the police toward him, his physical and mental state, [and] the diverse pressures which sap or sustain his powers of resistance or self-control.'" Id. at 574 (quoting Culombe, 367 U.S. at 602). Thus, the Supreme Court indicated that the physical and mental state of the defendant is relevant to the inquiry as to what constitutes "coercion." Id.

In United States v. Rohrbach, 813 F.2d 142, 145 (8th Cir. 1987), decided shortly after the Connelly decision, the Eighth Circuit applied the holding in Connelly to affirm the district court's determination that the defendant's

confession was voluntary. In <u>Rohrbach</u>, the defendant made an argument nearly identical to that advanced by Connelly, that is, that "his personal characteristics, including minimal formal education and a history of alcohol and drug abuse and of suicide attempts, are indicative of an easily overborne will." <u>Id.</u> at 144.

Like the police in <u>Connelly</u>, the police in <u>Rohrbach</u> had no indication that the defendant suffered from any mental impairments or infirmities and there was no police overreaching or coercion. <u>Id.</u> at 145. The court rejected Rohrbach's argument, holding that, in light of <u>Connelly</u>, the fact that Rohrbach had not proved, or even alleged, any coercive activity by the law enforcement agents who interrogated him was fatal to his argument that his statement was involuntary. <u>Id.</u> at 144.

The Eighth Circuit came to the same conclusion in <u>United States v. Makes Room For Them</u>, 49 F.3d 410 (8th Cir. 1995), in which the defendant argued, *inter alia*, that both his confession and <u>Miranda</u> waiver were involuntary due to his lower-than-average intelligence. <u>Id.</u> at 415. The defendant contended that his limited intellectual abilities made him more susceptible to having his will overborne. <u>Id.</u> The court rejected this argument, finding that, "[a]lthough age, education, and experience are factors in the voluntariness analysis, they are not dispositive." <u>Id.</u> The court further stated:

> We may assume for the sake of argument that Makes Room had a somewhat diminished capacity to resist pressure to waive his rights and confess. However, this is one of two factors; we must also consider the conduct of the police. We simply do not find the requisite coercive activity here.

34

Id. (citations omitted).

The Rohrbach case contains the singular statement that, "Connelly makes it clear that such personal characteristics of the defendant are constitutionally irrelevant absent proof of 'coercion brought to bear on the defendant by the State.'" 813 F.2d at 144 (quoting Connelly, 479 U.S. at 167). One might read this passage to mean that the court must first conclude that there was police coercion, considering that matter in a vacuum without reference to the defendant's characteristics, before evidence of a defendant's characteristics become relevant. However, such an interpretation is not warranted in the context of the case, nor in light of the teachings of the Supreme Court.

First of all, although Rohrbach states that a defendant's state of mind is irrelevant until coercion is first found, this is understandable in that the facts presented were nearly identical to the facts in Connelly:  the police did not know the defendant had any mental infirmities, there was no outward indication of the infirmities, and there was no police coercion or overreaching. Compare Rohrbach, 813 F.2d at 144 with Connelly, 479 U.S. at 161.  Under such circumstances, it is really not necessary to consider the defendant's mental conditions.  Secondly, although Rohrbach appears to state that a defendant's state of mind is irrelevant, the court nevertheless considered the defendant's state of mind in reaching its conclusion that there had been no police overreaching or coercion.  Rohrbach, 813 F.2d at 144-46.

35

A final reason that the <u>Rohrbach</u> court's statement that a defendant's state of mind is irrelevant should not be taken at face value is that such a statement would be contrary to Supreme Court precedent, which continues to hold that the test for determining whether a defendant's statement was voluntary is the totality of circumstances. <u>See</u> <u>Withrow v. Williams</u>, 507 U.S. 680, 688-89 (1993) (citing <u>Arizona v. Fulminante</u>, 499 U.S. 279 (1991); <u>Miller v. Fenton</u>, 474 U.S. 104, 109-10 (1985)). Indeed, earlier in the opinion, the <u>Rohrbach</u> court itself stated that the totality-of-the-circumstances was the appropriate test. 813 F.2d at 144.

Other Eighth Circuit cases subsequent to the <u>Rohrbach</u> and <u>Connelly</u> decisions continue to examine the defendant's characteristics as part of the totality-of-the-circumstances test. <u>See, e.g.</u>, <u>Makes Room For Them</u>, 49 F.3d at 415. In <u>Makes Room For Them</u>, the Eighth Circuit stated of the defendant's argument that his low intelligence and education rendered him "peculiarly susceptible to having his will overborne," that, "[c]onsidering these factors in totality, we cannot find that Makes Room's will was overborne, either as regards his confession or his <u>Miranda</u> waiver." <u>Id.</u> The court considered the defendant's characteristics as part of the totality of circumstances, even though it went on to conclude that there was no coercive activity on the part of the police. <u>Id.</u>

The decision in <u>Makes Room For Them</u> is not necessarily inconsistent with the sentence in <u>Rohrbach</u> that the defendant's state of mind was "irrelevant." Rather, the cases can be harmonized by resorting to the <u>Connelly</u>

decision.  When the Connelly Court held that there must be police coercion as a necessary predicate to finding a statement to be involuntary, that did not necessarily mean that a defendant's characteristics are irrelevant.

Under the totality of circumstances test, which is still the relevant test, the defendant's characteristics are relevant to the extent the police knew or should have known of those characteristics and deliberately exploited those characteristics.  Hence, in a case like Connelly, where the homicide detective had no reason to know of Connelly's mental illness, the inquiry as to whether there was police coercion necessarily excludes Connelly's personal characteristics.  And, in a case like Blackburn or Makes Room For Them, where the personal characteristics of the defendant are known to police or readily apparent, the courts have considered those characteristics in determining whether police engaged in coercion or overreaching.  See also Jenner v. Smith, 982 F.2d 329, 333-34 (8th Cir. 1993) (holding that a defendant's personal characteristics bearing on her ability to resist interrogation pressures is relevant, but cannot alone render the statement involuntary without police coercion or overreaching being also present).

Indeed, although the Connelly Court was very clear that police coercion was *required* before a statement could be found to be involuntary, there is every indication that the Court contemplated that the defendant's mental status would still be considered in deciding *whether* police coercion existed.  For example, the Court stated that:

> [A]s interrogators have turned to more subtle forms of
> psychological persuasion, courts have found the mental condition

> of the defendant a more significant factor in the "voluntariness"
> calculus.  But this fact does not justify a conclusion that a
> defendant's mental condition, by itself and apart from its relation
> to official coercion, should ever dispose of the inquiry into
> constitutional "voluntariness."

Connelly, 479 U.S. at 164 (citation omitted).  Thus, the Court indicated that a

defendant's mental status, *as it relates to police coercion*, is still relevant.  And

in the passage discussing the Blackburn and Townsend decisions, the Court

stated that examination of the defendant's state of mind could never *conclude*

the due process inquiry, thus leading to the obvious inference that a

defendant's state of mind was still *part of* that inquiry.  Id. at 165.  This

reading of Connelly is affirmed by the Court's subsequent decision in Spring

where the Court enumerated the defendant's physical and mental condition as

relevant to the inquiry regarding coercion has taken place.  Spring, 479 U.S. at

574.

### 3.    Application of the Law to Mr. Debevec's Statements

The court applies the totality of circumstances test to evaluate whether

Mr. Debevec's free will was overborne by police.  Withrow, 507 U.S. at 688-89.

He emphasizes his lack of sleep, back pain, and the fact that he was taking

various medications as evidence that his statement was involuntary.  Because

Mr. Debevec advised his interrogators of these conditions, the police knew

about them so consideration of these conditions as part of the totality of the

circumstances test is appropriate.

The Eighth Circuit has held that "neither exhaustion nor intoxication will

necessarily" render a statement or Miranda waiver involuntary.  United States

v. Korn, 138 F.3d 1239, 1240 (8th Cir. 1998) (citations omitted).  In United States v. Vinton, 631 F.3d 476, 482 (8th Cir. 2011), Vinton argued that his statements to police were involuntary because he had a history of drug abuse and a borderline I.Q.  The Eighth Circuit affirmed the district court's denial of Vinton's suppression motion on these grounds, noting that police officers testified that Vinton was coherent and rational when he spoke with the officers, that he had had previous confrontations with police, and multiple felony convictions.  Id.  The court stated that "a history of interaction with the criminal justice system supports an inference that an interviewee is familiar with his constitutional rights."  Id.  As for lack of education or below-average intelligence, the court conceded that these were valid factors in the totality of the evidence test, but they "do not dictate a finding of involuntariness, particularly when the suspect is clearly intelligent enough to understand his constitutional rights."  Id. (citation omitted).

In a similar case, Annis was arrested in the midst of shooting up methamphetamine; he scuffled with police and suffered a "minimally displaced fracture of his orbit and a facial bone," for which he was treated with ice and Tylenol.  United States v. Annis, 446 F.3d 852, 854 (8th Cir. 2006).  Two days after his arrest, Annis communicated with the investigator through his sister, who told the investigator Annis was in pain and wanted to speak to the officer.  Id. at 855.  The investigator came to the jail and Annis gave an incriminating statement after having been read his Miranda rights.  Id.  The Eighth Circuit

rejected his argument that his waiver and his statement were both involuntary due to the pain he was experiencing and his drug withdrawals.  Id. at 856.

Citing Makes Room [For Them], the court stated there was no *per se* rule that intoxication rendered a statement involuntary.  Id.  Instead, a defendant must demonstrate that his mental impairments caused his will to be overborne.  Id. (citation omitted).  Annis provided no such evidence.  Id.  The court noted that the government's evidence showed Annis answered questions rationally, read and reviewed his written statement twice, and signed the statement.  Id.  He showed no outward signs of being in pain or suffering from withdrawal.  Id.

Here, Mr. Debevec told officers that he had had two hours of sleep the night before and was taking an ulcer medication as well as an anti-anxiety drug.  He mentioned the pain reliever Gabapentin, but he did not make clear that he had ingested any of this pain medication recently.  He also told officers his back hurt him.

But far from exploiting these weaknesses, if weaknesses they were, the officers took steps to ensure Mr. Debevec understood the questions the officers were asking, understood his rights, and understood what the officers were investigating.  He was afforded many opportunities for bathroom breaks, at least two of which he declined.  The officers afforded him with as much water as he wanted.  During the polygraph Mr. Debevec was told he would have the opportunity to stand and stretch his back every five to seven minutes.  At no time did Mr. Debevec appear not to understand the officers' questions or give

answers that were nonsensical or unresponsive.  At no point did he fall asleep from fatigue.  Mr. Debevec admitted he had had prior experience with interrogation by federal officers.

There was no evidence during the officers' interactions with Mr. Debevec that the two medications Mr. Debevec did affirmatively indicate he had ingested (for his ulcer and his anxiety) interfered with his ability to understand and respond appropriately.  By his answers, it is clear he was following and understanding what was being said to him by all three agents and that he was able to answer appropriately.  Mr. Debevec's statement that Sertraline "messed with him" is not evidenced in his conduct or demeanor during the time he was with the investigating agents.

Mr. Debevec engaged with the rights advisement forms he was asked to read and sign, asking questions and initialing each item.  The room in which the questioning took place was not filled with police.  Finally, the duration of the combined interviews and polygraphs (a little over five hours) is not the kind of sustained duration that has been found to be in and of itself coercive, especially because the five-hour duration was punctuated with frequent breaks where Mr. Debevec was alone, able to stretch, and visit the bathroom.  He was not held incommunicado as the officers allowed him to telephone his wife during the course of the five hours.

Mr. Debevec specifically takes issue with the fact that SA Johnson did not define the term "minor" and that SA Johnson exhibited a brusque attitude during the polygraph.  The court finds that SA Johnson made sufficiently clear

41

that when he asked about sex with "a minor" he was referring to someone under the age of 16.  He explained that 16 was the age of consent in most states and that he was interested in exploring the topic of whether Mr. Debevec had ever had sex with someone less than age 16.  Twice Mr. Debevec mentioned a co-worker at Pizza Hut and twice SA Johnson said he was not interested in exploring that situation if the co-worker was at least 16 years old.  As for the polygrapher's brusque manner, it is true SA Johnson was a no-nonsense interrogator.  But at no time did he yell at Mr. Debevec, use swear words, physically touch Mr. Debevec, or lean into or over Mr. Debevec's personal space.

The court concludes that, based on the totality of circumstances, the statements Mr. Debevec gave to the agents before, during, and after his polygraph examination were the product of his free will.  Accordingly, this magistrate judge recommends that Mr. Debevec's motion to suppress these statements on the grounds that they are involuntary be denied.

**B.    Searches of Mr. Debevec's Cell Phone**

### 1.    Discrepancy Between Description of Search Described in the Search Warrant and the Search Actually Conducted

The search warrant, in attachment A, authorized the search of a "Samsung" phone with the phone number of 307-258-1086 and a pass code of 1995.  Ex. 16 at p. 4.  Attachment B to the search warrant authorized investigators to depress the thumb/fingerprint of "Kent Mews" on the phone if necessary to open the Apple iPhone, iPad, or other Apple brand device.  Id. at pp. 5-6.  Attachment C to the search warrant was the indictment of Mr.

Debevec, which included a forfeiture allegation for "a black Motorola XT2215-1 cellular phone." Id. at pp. 7-8. Attachments A and B were incorporated by reference into the search warrant, but not attachment C. Id. at p. 1.

The affidavit in support of the search warrant was referenced, but not incorporated by reference, into the search warrant. Id. The affidavit described the thing sought to be searched as a "Samsung" cell phone with phone number 307-258-1086 and a passcode of 1995. Ex. 17 at p. 2. Attachment B to the affidavit sought permission to depress the thumb/fingerprint of "Jayden Debevec" on the Apple device if necessary to open the device. Id. at p. 15. The phone number and the passcode listed in the search warrant documents were correct. The make of the phone was incorrect and should have read "Motorola."

Mr. Debevec argues that the search warrant authorized search of a Samsung phone, but investigators actually searched a Motorola phone, so the search conducted on the Motorola phone was outside the purview of the warrant. Because the search of the Motorola phone was not authorized by the warrant and was a warrantless search, Mr. Debevec argues the results of the search of the Motorola phone must be suppressed.

There is no doubt the search warrant and its attachments were the result of sloppy drafting. Why include the paragraph in attachment B about using the thumb/fingerprint of the suspect (Kent Mews or Jayden Debevec) to open the "Apple" device when neither a Samsung nor a Motorola cell phone is a product manufactured by Apple and where the officers already had in their

possession the passcode for the phone and so would not need any biometrics to open the phone?  Likewise, the error throughout the affidavit and attachment A in describing the phone as a "Samsung" when it was really a "Motorola" also evidences a lack of attention to detail.  The question is whether the mistaken description of the phone invalidates the search.

The Fourth Amendment requires search warrants to describe with particularity the place to be searched.  U.S. CONST. amend. IV.  The purpose of the requirement is to prevent the kind of "wide-ranging exploratory searches" that the Crown of England had allowed prior to adoption of the Constitution. Maryland v. Garrison, 480 U.S. 79, 84 (1987); Stanford v. Texas, 379 U.S. 476, 481 (1965).  Whether a description within a search warrant is constitutionally valid depends on whether it "enable[s] the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched." United States v. Gitcho, 601 F.2d 369, 371 (8th Cir. 1979); United States v. Palega, 556 F.3d 709, 713 (8th Cir. 2009).  Where one part of the description of the premises to be searched is accurate, but other parts of the description are inaccurate, such warrants have been "routinely upheld."  Gitcho, 601 F.2d at 371; Palega, 556 F.3d at 713.

In one case, the search warrant listed the wrong street address (a nonexistent address) to be searched, but investigators actually searched the correct, intended address.  Gitcho, 601 F.2d at 372.  Because the officers were personally familiar with the correct location of the premises to be searched,

44

and because that location had been under constant surveillance while the warrant was being obtained, the court held the chances of the wrong address being searched were remote.  Id.  The validity of the search did not violation the Fourth Amendment's particularity requirement.  Id.

In another case, the search warrant listed the wrong first name of the owner of the premises to be searched—Morris Palega aka "Q" whereas "Q" was not Morris' alias but rather the alias of Ekueta Palega.  Palega, 556 F.3d at 713.  The court rejected defendant's argument that the mistake invalidated the warrant, calling the use of the wrong first name "a negligible error."  Id. at 714.  The court noted the premises to be searched was accurately described except for the owner's first name, the investigators had previously conducted surveillance on the correct premises, had previously photographed the correct premises, and actually searched the correct premises.  Id.  The search was upheld.  Id. at 713-14.

One search warrant described the premises to be searched by stating a series of directions to the home, but the description left off the final turn that officers should make to reach the premises.  United States v. Rogers, 150 F.3d 851, 854-55 (8th Cir. 1998).  Without the description of the final turn, one would be left with a choice between entrances to two properties:  one the intended premises (belonging to Rogers) and another premises belonging to Crook.  Id. at 855.  The court upheld the search warrant because officers had searched the correct premises and the Crook premises differed materially in its physical description from the description of the premises set forth in the search

45

warrant.  Id.  The Crooks property contained a new white house and chicken broiler houses, "which did not fit the description in the affidavit.  In contrast, the other entrance to the Rogers property did fit the description."  Id.  The court held that the description in the warrant was sufficiently detailed to allow the officers to identify the correct premises to be searched and to prevent a search of the wrong premises.  Id.

Applying the above law, the court considers whether the description in the search warrant was sufficient to allow officers to reasonably search the correct cell phone and whether that description was sufficient to prevent the search of the wrong cell phone.  Palega, 556 F.3d at 713.  The court concludes it was.

The phone number of the phone to be searched was correctly stated in the warrant and attachments as was the passcode for the phone.  The search warrant was for the search of a phone described as Jayden Debevec's phone, which was also a correct description.  Furthermore, the court relies on the description of how the phone was identified as the correct phone to be seized--a "test" message from Zoee was sent and the phone was seized when officers saw that message from Zoee displayed on the phone, thus confirming it was the same phone number and device that had been used for texting with Zoee.

Once seized, the phone was placed into airplane mode, placed in an evidence bag, and a reference case file number was placed on the bag.  It was from this bag that SA Hauck testified he removed the phone and extracted its contents.  Given these facts, the court finds that there was very little chance

the wrong phone could have been searched and, in fact, the right phone was searched.  The court concludes that the mistaken description of a "Samsung" phone in the search warrant and attachments does not invalidate the search conducted of Mr. Debevec's Motorola phone.[11]

In the event a reviewing court disagrees with this analysis and finds the search warrant to be invalid because of the Motorola/Samsung mistake, this court would recommend reaching the same result under <u>Leon</u> good faith.  The <u>Leon</u> good faith doctrine prevents suppression of evidence seized pursuant to a search warrant that is later determined to lack probable cause or fail to meet the Fourth Amendment's specificity requirements when, *inter alia*, the officers relied in objective good faith on the validity of the search warrant.  <u>United States v. Ross</u>, 487 F.3d 1120, 1122-23 (8th Cir. 2007) (describing <u>Leon</u> good-faith exception and citing <u>United States v. Leon</u>, 468 U.S. 897, 921, (1984)). "When assessing the good faith of the officers, [the court] look[s] to the totality of the circumstances, including any information known to the officers, but not included in the affidavit." <u>United States v. Rodriguez</u>, 484 F.3d 1006, 1011 (8th Cir. 2007).  The question is whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization.  <u>United States v. Hudspeth</u>, 525 F.3d 667, 676 (8th Cir. 2008).

---

[11] The reference to Kent Mews in Attachment B was irrelevant to the search warrant.  This provision gave permission to officers to use biometrics to open the phone if necessary.  Because officers had the passcode to Mr. Debevec's phone there would have never been a need to resort to the use of biometrics to access the phone's contents.

Here, the search warrant and its attachments described a phone with the correct phone number, the correct passcode, and the correct owner. SA Jacob was not the officer who seized the phone from Mr. Debevec's vehicle and placed it into an evidence bag, nor was he the one who took it out of the evidence bag and extracted its contents with the Graykey tool. SA Jacob was presented with an external drive loaded with the Cellebrite software and the cell phone extraction loaded onto that software and was told this was Jayden Debevec's phone. SA Jacobs then executed the search warrant on the data on that external hard drive by applying the date filters and examining the resulting data. Under the totality of circumstances, the court finds that the information known to SA Jacobs demonstrates objective good faith reliance on the validity of the search warrant.

### 2. Scope of the Search Authorized Versus the Search Actually Conducted

Mr. Debevec also seeks to suppress the fruits of the search of his phone on the grounds that the government's search exceeded the scope of the search allowed by the search warrant. Specifically, the warrant authorized the search and seizure of information on the phone from January 1, 2023, to the present (at the time that was March 15, 2023), that was relevant to the crime of attempted enticement of a minor using the internet. Mr. Debevec asserts that, despite the date restriction, the government downloaded the entirety of the contents of his phone and, thus, that the fruits of the search of his phone should be suppressed. The court rejects this argument.

Where searching officers obey the dictates of a search warrant as to the places to be searched, but unlawfully seize items that are not authorized to be seized under the terms of the warrant, the unlawfully seized items must be suppressed, but the lawfully seized evidence is not subject to exclusion. Waller v. Georgia, 467 U.S. 39, 43 n.3 (1984); United States v. Decker, 956 F.2d 773, 779 (8th Cir. 1992). To the extent the entirety of Mr. Debevec's phone is considered the same "place," the evidence adduced at the evidentiary hearing was that SA Hauck extracted (i.e. seized) the entire contents of the phone and provided it to SA Jacobs, but SA Jacobs restricted his search to the time frames set forth in the warrant. Furthermore, there was *no evidence* discovered by the government from outside the date restrictions specified in the warrant. Therefore, there is no evidence to suppress. Waller, 467 U.S. at 43 n. 3; Decker, 956 F.2d at 779.

As to searches of *different* places, to explain by analogy, if a search warrant authorizes a search of a filing cabinet, and the officers executing the search warrant search both the cabinet and the house it is in, the items found in the cabinet would not be subject to suppression, but the items found in the rest of the house *would be* subject to suppression. An exception to this rule arises only where officers show a "flagrant disregard for the limitations of the search warrant [that] might make an otherwise valid search an impermissible general search and thus require the suppression or return of all the evidence seized during the search." Decker, 956 F.2d at 779 (quoting United States v. Marvin, 732 F.2d 669, 674–75 (8th Cir. 1984)). Here, to the extent Mr.

49

Debevec is arguing that the government searched his entire "house" when it should have restricted its search to the "filing cabinet," there remains no showing of flagrant disregard. Rather, the testimony at the hearing evinced that Agent Jacobs honored the limitations of the warrant through his process of applying the filter functionality in Cellebrite. His incidental access to data exceeding the scope of the warrant is too slender a reed to support total suppression.

The court agrees with Mr. Debevec's counsel on one point: HSI can improve its process for searching cell phones. SA Hauck and SA Jacobs described a three-step process when searching a digital device: (1) extraction of the whole contents of the device using Graykey, (2) transfer of those contents to an external drive with the Cellebrite software, and (3) a date-restricted search of that external drive using the date filters available on Cellebrite. In Mr. Debevec's case, SA Hauck performed steps one and two and SA Jacobs performed step three.

The testimony at the hearing was that Graykey, the tool used to extract an electronic device's contents at step one, does not allow for a partial extraction of data from an electronic device. If that is true, then overinclusion of data at step one is unavoidable.

However, it is possible for a computer forensics agent like Agent Hauck—someone with no ties to the investigation underway—to apply the date filters *before* turning the data over to the investigating agent. In other words, the computer forensic agent can perform step two *and* step three. An investigating

50

agent such as SA Jacobs can then execute the search on the product provided to him after step three. The court finds this to be a better procedure that would more closely adhere to Fourth Amendment dictates. And, of course, if technology improves which would allow seizure at step one to be restricted, the government must adapt to that improving technology in its search protocols.

The government argued that allocating step three to the forensic computer agent may result in loss of some data (for example, in the case of chats where the first communication in the string occurred on a date before the earliest date of the date restriction). But the same risk of loss of some data occurs when the investigating agent applies the date restriction at step three. The difference is that by having a neutral agent apply the date filters and then providing the date-restricted data to the investigating agent, there is less of a chance that the resulting search will exceed the scope of the warrant. However, the process HSI used in Mr. Debevec's case did not result in a violation of his Fourth Amendment rights. Therefore, the court recommends denying Mr. Debevec's motion to suppress the fruits of the search of his cell phone.

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends denying Jayden Debevec's motion to suppress [Docket No. 42] in its entirety.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 28th day of June, 2024.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge