UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAYDEN DEBEVEC,<br><br>Defendant. | 4:23-CR-40033-KES<br><br>ORDER ADOPTING REPORT AND RECOMMENDATION AS MODIFIED AND DENYING MOTION TO SUPPRESS |

Defendant, Jayden Debevec, is charged with attempted enticement of a minor using the internet under 18 U.S.C. § 2422(b). Docket 15. Debevec moves to suppress certain evidence obtained after his arrest on March 5, 2023. *See* Docket 42. Debevec alleges that his statements made during the polygraph and post-polygraph interview were involuntary under the Fifth Amendment. Docket 43. Debevec also alleges that evidence obtained from a search of his Motorola cell phone violated the particularity requirement for search warrants under the Fourth Amendment and that the search exceeded the scope of the warrant. *Id.* The United States resists Debevec's motion to suppress. Dockets 48, 53.

The court referred Debevec's motion to a magistrate judge under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, the magistrate judge recommended Debevec's motion to suppress be denied. Docket 55. Debevec then filed objections to the Report and Recommendation. Docket 61. After a de novo review of the Report and Recommendation and a review of the record, the

court adopts the Report and Recommendation as modified below and denies Debevec's motion to suppress.

**LEGAL STANDARD**

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

I. **FACTS**

After a de novo review of the transcript of the evidentiary hearing and the exhibits received into evidence, the court makes the following factual findings:

A. **Arrest and Seizure of Debevec's Cell Phone**

On March 5, 2023, Debevec was arrested and charged with attempted enticement of a minor using the internet under 18 U.S.C. § 2422(b) as part of a sting operation by Homeland Security Investigations (HSI) and other law enforcement agencies. Docket 1. HSI Special Agent Richie Berger (SA Berger)

posed as a 15-year-old female named "Zoee" on the chat application "MeetMe" and communicated with Debevec. Docket 1-1 at 2; Docket 58 at 6. The two communicated by phone text message between March 4 and March 5, eventually agreeing to meet at Cherry Rock Park in Sioux Falls, South Dakota. Docket 58 at 7-8. On March 5, Debevec arrived at Cherry Rock Park in his Jeep and was arrested.[1] *Id.* at 37-38.

While at Cherry Rock Park, body and dash camera captured still images of Debevec's Jeep exterior and interior, including Debevec's Motorola phone inside his vehicle. Exs. 5-9. HSI Special Agent Jacob (SA Jacob) testified that he sent a test text message to Debevec's phone to confirm the device and phone number in Debevec's Jeep were the same as the device and phone number used to communicate with SA Berger while posing as Zoee. Docket 58 at 20-21. Debevec's phone received the test text message. *Id.*; Ex. 9. Testimony during the suppression hearing revealed that the phone was seized by Special Agent Zoe Brubaker from Debevec's Jeep. Docket 58 at 21.  The phone was switched to airplane mode and placed in an evidence bag at the scene. *Id.* at 82. Debevec was then arrested and taken into custody at the HSI office. *See id.* at 9.

---

[1] There was no evidence admitted at the evidentiary hearing on June 11, 2024, of the interaction between law enforcement and Debevec at Cherry Rock Park. The audio and video of Debevec's pre-polygraph, polygraph, and post-polygraph interviews at the HSI office in Sioux Falls were admitted into evidence. *See* Exs. 1 & 2.

### B. Pre-Polygraph Interrogation

Upon arriving at the HSI office, Debevec was taken into an interrogation room where the agents offered him water and a bathroom break.[2] Ex. 1 at 17:13:42-13:52. While discussing topics unrelated to the case, Debevec stated that he had been interviewed by federal law enforcement before on an unrelated matter. *Id.* at 17:17:34. The agents then read Debevec his *Miranda* rights. *Id.* at 17:18:24. Debevec maintained that he understood his rights, opted to sign the waiver form, and agreed to talk with the agents. *Id.* at 17:18:45. Debevec next provided the agents with the passcode and phone number to his phone to discuss the text messages he exchanged with Zoee. *Id.* at 17:20:05-20:39.

The agents interrogated Debevec for about an hour-and-a-half concerning the text messages between Debevec and Zoee. *Id.* at 17:13:30-18:35:08. The agents did not offer Debevec any breaks during the interview. The agents also mentioned to Debevec that he would have the opportunity to take a polygraph test after the interrogation. *Id.* at 18:03:53. Debevec responded, "Okay." *Id.* at 18:03:04. Debevec stated that he wanted to coordinate transport of his vehicle from the park, talk with his wife, and talk with his director (his boss). *Id.* at 18:30:41. SA Jacob responded, "talking to

---

[2] The government acknowledged at the hearing that the time stamp on the video is incorrect. Debevec was arrested at 17:22 on March 5, 2023, according to law enforcement reports and body camera footage. The camera in the interview room, however, starts at 17:13:30 on March 5, 2023. Ex. 1. The court will use the time stamp indicated on the video for consistency but recognizes that the time stamp does not reflect the actual time of day. Importantly, the time elapsed on the video is accurate.

your wife, talking to the director, handling the car, I will have you make calls. That's no problem. (Mr. Debevec - "Okay.") But after we're done here, you're probably going to jail." *Id.* at 18:30:53. Debevec did not admit his intention to have sex with Zoee during the pre-polygraph interview.

At the end of the pre-polygraph interrogation, the agents asked Debevec if he took any pills or drugs that day. *Id.* at 18:34:08. Debevec said "oh no, no no." *Id.* Debevec explained that he has ulcer medication he needs to take twice a day, but that, to his knowledge, he is soberminded. *Id.* at 18:34:17. When asked if he was under the influence of anything that may have caused him to answer questions with poor judgment, Debevec answered, "Other than Sertraline, I don't think so. So Sertraline is anti-anxiety. However, it does-it has been messing with me. Um, my work has noticed it as well." *Id.* at 18:34:47.

Debevec also said "yes" when asked whether he was treated with respect by the agents during their conversation. *Id.* at 18:34:32. Debevec then asked for another bottle of water. *Id.* at 18:35:12. The agents left the room for about five minutes and returned with another bottle of water and the polygrapher, Special Agent Michael Johnson (SA Johnson). *Id.* at 18:35:16-40:20.

SA Johnson explained to Debevec that the purpose of the polygraph was because he was concerned that Debevec had sexual contact with a minor in the past or would in the future. *Id.* at 18:41:16. Debevec asked whether he needed to take the polygraph; SA Johnson responded, "Uh, I think so. Because there's uh-here's-here's the thing Jayden. Um, with a case like yours, um [sigh] there are a lot of unanswered questions, right? Uh, we don't know anything about

you other than just this snapshot of what we've seen today, all right?" *Id.* at 18:42:16. Debevec answered, "Okay." *Id.* at 18:42:33.

SA Johnson again mentioned consent to the polygraph and offered Debevec a bathroom break (which he declined). *Id.* at 18:44:05. Debevec did not decline to take the polygraph. *Id.* at 18:44:05-44:50. SA Johnson told Debevec that he wanted to give him a short break because Debevec had spoken with the agents for a while. *Id.* at 18:44:18. After SA Johnson left the room to set up the polygraph, SA Jacob offered Debevec another bathroom break, which he declined. *Id.* at 18:44:45.

Debevec was left alone in the room for about 17 minutes. *Id.* at 18:44:50-19:02:20. During that time, Debevec leaned forward in his chair, stretched, leaned back, fidgeted with his hands, and audibly took deep breaths. *Id.* About 14 minutes in, Debevec stood up, stretched against the wall and table, and exclaimed, "oh f**k my back." *Id.* at 18:59:45. Not once did Debevec appear to sleep or try to sleep. SA Jacob returned and offered Debevec another bathroom break that Debevec again declined. *Id.* at 19:02:24. The agents then took Debevec to the polygraph examination room. *Id.* at 19:02:47.

### C. Polygraph Examination

Before beginning the polygraph, SA Johnson told Debevec he would take a practice polygraph exam. *Id.* at 19:06:15. In addition, Debevec was again read his *Miranda* rights, completed a polygraph consent form, and asked a series of questions regarding his medical and sexual history.

SA Johnson read Debevec his *Miranda* rights and asked Debevec whether he understood his rights, which Debevec answered affirmatively. *Id.* at 19:07:50-08:50. SA Johnson specifically emphasized that if Debevec decided to answer questions, he could stop the entire questioning process at any point to consult with an attorney. *Id.* at 19:08:40. Debevec then signed the *Miranda* waiver form indicating that he would answer questions at that time without his lawyer being present. *Id.* at 19:09:05-10:04.

SA Johnson next presented Debevec with the consent to polygraph form. *Id.* at 19:10:08. When SA Johnson had Debevec read the form out loud, Debevec paused when he read the statement, "I represent that I am in good health and know of no mental or physical problems that would impair my ability to submit to a polygraph examination." *Id.* at 19:11:56. Debevec then asked, "Does sertraline count or gabapentin out of that because when those two mix it screws with me . . . those two mixed together does not bode well for me before." *Id.* at 19:12:23. SA Johnson asked, "Tell me what you mean by it doesn't bode well for you?" *Id.* Debevec clarified, "it clouds, it clouds my brain." *Id.*

Debevec did not state that he was under the influence of any prescription drugs that night nor did he appear to be. Debevec finished reading the consent form aloud, confirmed he reread the form before he placed a check next to each provision, and signed his name at the bottom. *Id.* at 19:17:54. SA Johnson then permitted Debevec to call his wife before the polygraph began—something SA Johnson said was not his normal practice. *Id.* at 19:19:49-21:55.

When discussing Debevec's health, Debevec asked whether he would be able to pause the test due to a "bad L5" in his back and asserted that he could not sit down for too long. *Id.* at 19:06:32. SA Johnson asked "what do you mean by too long? Because you sat in the other room for quite a while." *Id.* at 19:06:40. Debevec clarified that he would need to be able to move around. *Id.* at 19:06:55. SA Johnson told Debevec he would need to sit still for five to seven minutes at a time but there would be ample time to move around between tests. *Id.* at 19:06:55. If it got to a point where Debevec must stand up, SA Johnson explained, he could take the components off. *Id.* at 19:07:24.

Debevec also revealed he took Sertraline for anxiety, took Gabapentin for neuropathy (symptom mostly "tingling" in his body), and had heart problems. *Id.* at 19:24:16-26:57. Other than his back pain, Debevec asserted he was not in any other pain or discomfort. *Id.* at 19:29:45. SA Johnson told Debevec to report any pain or discomfort throughout the polygraph. *Id.* at 19:30:10. During this exchange, Debevec stood and stretched his back. *Id.* at 19:25:42.

Debevec disclosed he had slept about two hours the night before because he had taken a nap earlier that afternoon. *Id.* at 19:30:18-30:39. Debevec also said he had not eaten since yesterday morning, which was not normal for him. *Id.* at 19:30:57. SA Johnson determined that Debevec was fit to take the polygraph,[3] and Debevec responded that he would "like to try . . . but I would

---

[3] At the suppression hearing, the defense called Phillip Toft to testify. Toft has been a polygraph examiner for over 24 years and works at Great Plains Credibility Services. Docket 58 at 101. Toft testified that Debevec was "marginally suitable" to take the polygraph. *Id.* at 111. Toft also testified that

also like to stop at any given time because that is my right to stop, correct?" *Id.* at 19:33:43. SA Johnson assured Debevec that he could "absolutely" stop the test any time he wanted to. *Id.* at 19:33:58.

SA Johnson next stated the parameters of the polygraph would be sexual encounters Debevec had when he was 18 years old up to the present day. *Id.* at 20:02:05. Debevec replied that when he worked at Pizza Hut when he was 19 or 20, he invited a coworker over to his house and was unsure whether she was over 18 years old. *Id.* at 20:02:18. SA Johnson clarified by describing "age-appropriate relationships," which he defined as "age-similar" relationships like a 19-year-old and a 16-year-old. *Id.* at 20:03:13. SA Johnson continued, "[I]f you were 25 working at Pizza Hut and she was 16, we'd want to talk about that . . . or [if she was] certainly under the age of 16 because most states say 16 is the age of consent." *Id.* at 20:03:34. A few minutes later, Debevec took another bathroom break. *Id.* at 20:05:35.

After explaining in detail how the polygraph would be administered, SA Johnson again tried to clarify age-appropriate relationships. Debevec yawned during the explanation. *Id.* at 20:17:01. SA Johnson stated "[w]hat I would not be talking about is, those age-appropriate relationships, the 18-year-old and the 16-year-old, the 19-year-old. When they are part of your peer group. And by peer group, I mean peer group by age. I don't mean a 28-year-old working in the same building with a 16-year-old." *Id.* at 20:17:13. He reiterated that age-

---

SA Johnson's overall demeanor towards Debevec was "somewhat combative." *Id.*

9

similar relationships are not what he was concerned about during the examination. *Id.* at 20:19:12. SA Johnson did not define what a "child" or "minor" was. Debevec yawned again just before SA Johnson began explaining another aspect of the polygraph. *Id.* at 20:19:30. SA Johnson did not acknowledge Debevec's tiredness. *Id.*

After discussing the questions that would be asked on the polygraph but before the practice exam started, SA Johnson asked whether Debevec was "clear on sexual contact." *Id.* at 20:22:40. Debevec answered, "Yes." *Id.* at 20:22:43. SA Johnson offered Debevec another bathroom break before beginning the practice polygraph. *Id.* at 20:22:58. While attaching the cardio cuff to Debevec's arm, Debevec confirmed that he was comfortable but said that he was having issues keeping his feet planted because of his hip. *Id.* at 20:26:43; 20:29:30. SA Johnson said that his positioning was fine. *Id.* at 20:29:45.

During the practice test, Debevec closed his eyes and was prompted by SA Johnson to keep them open. *Id.* at 20:33:38. Debevec also complained about his arm going numb and squeezed his hand repeatedly after the cuff was deflated. *Id.* at 20:34:20. After the practice polygraph, SA Johnson again reminded Debevec to keep his eyes open. *Id.* at 20:34:51. Debevec replied, "I am so sorry about that, I am about to-." *Id.* at 20:34:55.[4] SA Johnson then

---

[4] The magistrate judge observed in her Report and Recommendation that it sounds like Debevec is intentionally trying not to fall asleep. *See* Docket 55 at 16 n.8 ("This court observes that Mr. Debevec is responding to SA Johnson's statement about keeping his eyes open and that it sounds like Mr. Debevec is

discussed the questions for the actual polygraph without further defining the term "minor" or "child." *Id.* at 20:37:08.

The polygraph was administered four times spanning around 30 minutes total. *Id.* at 20:40:26, 20:49:20, 20:56:06, 21:03:52 (continuation of fourth test at 21:08:19). After the first test, Debevec was concerned that his hand was changing colors from the cardio cuff. *Id.* at 20:44:40. SA Johnson said that he had no concerns about it and asked Debevec if he wanted to continue. *Id.* at 20:44:50. Debevec paused and asked for a short break, to which SA Johnson agreed. *Id.* 20:45:30. SA Johnson added that he was not going to argue with Debevec about the test, stating "that doesn't hurt [indicating at the cuff]. It's uncomfortable, I'll give you that. It doesn't feel good. But it doesn't hurt." *Id.* at 20:46:20. SA Johnson then explained that his hand is turning colors because the cuff is restricting blood flow to that area. *Id.* at 20:46:35. Debevec said, "Okay." *Id.* Before the second polygraph, SA Johnson said, "if we're going to be doing this, it's just something you got to suck up for a little bit." *Id.* at 20:48:10. After the second test, Debevec stated that the cuff pressure was better. *Id.* at 20:53:22.

During the fourth test, Debevec yawned and stated, "I apologize, I'm tired, I'm doing everything I can to stay awake." *Id.* at 21:07:01. SA Johnson responded, "Yeah, well that's surprising because this is a pretty stressful event

---

saying, 'I am so sorry about that. I am about to fall asleep.' "). The court, however, is unwilling to find that Debevec stated he was about to fall asleep. It is too difficult to determine on the video what Debevec said because SA Johnson unintentionally spoke over Debevec and Debevec does not repeat himself.

in your life. I can't imagine that you can't find the ability to stay awake and pay attention." *Id.* at 21:07:15. About ten minutes after the test concluded, Debevec was allowed to use the bathroom. *Id.* at 21:23:30. Debevec was then alone in the same room for roughly ten minutes where he sat up, looked around, and fidgeted with his hands. *Id.* at 21:26:12-36:19. For about 20 seconds of this alone time, Debevec is sitting in his chair with his head down and appears to be sleeping. 21:28:17-28:37. It is difficult to discern in the video whether Debevec's eyes are closed, however.

### D. Post-Polygraph Interview

At the outset of the interview, SA Johnson told Debevec he failed the polygraph "because you have had sexual contact with a child." *Id.* at 21:36:35. Debevec explained that he failed because he knew the girl from Pizza Hut was only 16 while he was 19 or 20. *Id.* at 21:40:49. SA Johnson said, "16 is the age of consent. That is not what we are talking about. That is not the question. That is not the problem. . . . If that girl was 14 years old and you know that, that would be something. . . . Was she under the age of 16? *Id.* at 21:41:17-42:31. Debevec said, "No she was not." *Id.* at 21:42:32. After SA Johnson asked Debevec "how many other minor females have you had similar conversations with [like Zoee's]?", *id.* at 21:43:04, Debevec reiterated that his co-worker from Pizza Hut was the only one. *Id.* at 21:43:38. SA Johnson set his clipboard behind him and began clicking his pen multiple times—seemingly frustrated by Debevec's response. *Id.* at 21:43:47. Debevec, unprompted, stated, "I'm trying

to dig through my own memory to give you what you want." *Id.* at 21:43:55. SA Johnson replied, "I don't want anything." *Id.* at 21:44:00.

After about five minutes of SA Johnson convincing Debevec to be "100% honest" with him, Debevec admitted that it was his intention to have sex with a 15-year-old girl earlier that day. *Id.* at 21:48:26. The time elapsed from the beginning of the first interrogation to Debevec's confession was approximately four hours and thirty-five minutes. *See* 17:13:30-21:48:26. Debevec denied having any other sexual conversations with a minor, *id.* at 21:52:28, denied having any pictures or videos of any person under the age of 18 in a nude or sexual state, *id.* at 21:54:26, and denied having inappropriate sexual contact with a minor in the past. *Id.* at 21:56:30. SA Johnson again asked, "Your intention, all things considered today, was to have sex with a 15-year-old girl and that's why you drove to that park." *Id.* at 21:57:02. Debevec replied, "Yes, and I am ashamed to admit it." *Id.* at 21:57:09.

SA Johnson concluded by asking Debevec how he thought he was treated during the polygraph. *Id.* at 22:05:12. Debevec said that he thought SA Johnson knew his job very well. *Id.* at 22:05:18. SA Johnson also asked whether Debevec, if he ever had another polygraph, would mind if SA Johnson was the examiner. *Id.* at 22:07:31. Debevec responded that he would be okay with that. *Id.* at 22:07:37.

### E. The Search Warrant & Execution

SA Jacob applied for a search warrant of Debevec's phone and it was issued on March 15, 2023. Ex. 16 at 1. SA Jacob provided a supporting affidavit to accompany the warrant application. *See* Ex. 17.

The warrant incorporated by reference Attachments A & B, which respectively included the locations to be searched and the items to be seized. *See* Ex. 16 at 4-6. Attachment A described the location to be searched as "Jayden Debevec's Samsung phone with the phone number of 307-258-1086, with a pass code of 1995," that was currently in HSI's custody in Sioux Falls. *Id.* at 4; Docket 52 at 17. SA Jacob similarly referenced a Samsung phone in his supporting affidavit. *See* Ex. 17 at 2. Attachment B listed the items to be seized as "[a]ll records on the devices described in Attachment A, from January 1, 2023, to the present, that relate to violations [] of 18 U.S.C. § 2422(b)." Ex. 16 at 5; Docket 52 at 18. Paragraph 8 authorized the fingerprints of "Kent Mews" to be used to access the contents of the phone. Ex. 16 at 6.

At the suppression hearing, HSI Special Agent Hauck (SA Hauck) testified to the procedure for data extraction of an electronic device such as Debevec's.[5] *See* Docket 58 at 57-58. SA Hauck stated that when he receives a device, it has been placed into an evidence bag with a tracking number, such was the case with Debevec's phone. *Id.* at 58. He then plugs it into a power

---

[5] It was explained at the hearing that there is no HSI policy directing the agents to document the steps they have taken while extracting such contents from a digital device. Docket 58 at 95-96.

14

source and turns it to airplane mode until a warrant has been secured, which, again, was the case here. *Id.* at 57-58.

Once a warrant is obtained, the first step of extraction uses a program called Graykey to download the entire contents of the device. *Id.* at 59. The Graykey program is not capable of limiting the content download of the device—it can only download everything at once. *Id.* at 61. Step two includes using a software called Cellebrite, which transfers the downloaded contents to an external drive. *Id.* at 63. At step three, a date-filter is applied to the contents—using Cellebrite—according to date limitations in the warrant. *Id.* at 64. SA Hauck also testified that, generally, before conducting step one, he must enter the phone's passcode to access its contents. *Id.* at 83. SA Hauck stated that he could not recall if he used the passcode for Debevec's phone before conducting step one. *Id.*

After reading what he deemed as pertinent parts of the warrant—including its incorporated attachments—SA Hauck conducted steps one and two, *id.* at 61-62, 69-70, while SA Jacob executed step three. *Id.* at 51-52. SA Hauck then provided SA Jacob with the data from Debevec's phone. *Id.* at 74. SA Jacob testified that he did not search contents outside the date range specified in the warrant. *Id.* at 51. It was further noted by the government at the suppression hearing that there is no evidence in discovery from outside the date range and the government does not intend to offer any evidence at trial that is outside the date range of the search warrant. *Id.* at 135-36.

15

## II.   DISCUSSION

### A. Debevec's Factual Objections

Debevec makes three objections to the facts in the Report and Recommendation.

Debevec first objects to the magistrate judge's factual statement "that SA Hauck testified that the evidence bag was 'sealed.' " Docket 61 at 2; *see* Docket 55 at 23. Debevec is correct. SA Hauck did not testify that the evidence bag holding Debevec's phone was sealed. He testified that the phone was "placed" into an evidence bag. Docket 58 at 58. Thus, the objection is sustained, and the Report and Recommendation is modified to clarify that SA Hauck did not testify that the evidence bag was sealed when he received it.

Debevec next objects to the magistrate judge's factual statement that "Mr. Toft agreed with SA Johnson's determination that Mr. Debevec was marginally suitable to take the polygraph." Docket 61 at 2; *see* Docket 55 at 26. According to Debevec, "Phillip Toft testified that SA Johnson stated that Debevec was 'fit to take the polygraph.' . . . Meanwhile, Toft found that Debevec was only 'marginally suitable' to take the polygraph." Docket 61 at 2. Debevec is correct. The video shows SA Johnson stating that Debevec was fit to take the polygraph, Ex. 1 at 19:33:43, while Toft's testimony was that Debevec was only "marginally suitable" to take the polygraph. Docket 58 at 111. Thus, the objection is sustained, and the Report and Recommendation is modified to

16

clarify that SA Johnson and Toft did not agree that Debevec was "marginally suitable" to take the polygraph.

Finally, Debevec objects and asks to "add facts to the factual summary" in the Report and Recommendation. Docket 61 at 2. Specifically, the magistrate judge omitted the statement that was made by Debevec during his interview, namely: "I'm trying to dig through my own memory to give you what you want." Ex. 2 at 21:43:54. Debevec requests this court consider this statement along with the tone and tenor of the interview in its voluntariness analysis. Docket 61 at 2. Debevec indeed made this statement during his post-polygraph interview and the magistrate judge omitted this statement from the Report and Recommendation. Thus, this objection is sustained, and the Report and Recommendation is modified to reflect that Debevec made the statement.

### B. Debevec's Objections to Legal Conclusions

#### 1. Whether Debevec's polygraph and post-polygraph statements were voluntary

Under the Due Process Clause of the Fifth Amendment, the defendant's statements must be voluntary; that is, they must be the "product of his free and rational choice." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978) (quoting *Greenwald v. Wisconsin*, 390 U.S. 519, 521 (1968)). Whether a confession is voluntary must be judged by the totality of the circumstances, *see United States v. Pierce*, 152 F.3d 808, 812 (8th Cir. 1998), and "requires more than a mere color-matching of cases." *Mincey*, 437 U.S. at 401.

A voluntariness inquiry requires the court to analyze the "conduct of the officers and the characteristics of the accused." *United States v. LeBrun*, 363

F.3d 715, 724 (8th Cir. 2004). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Id.* (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' " *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987). The Supreme Court has provided some insight as to the traditional indicia of police coercion, including "the duration and conditions of detention . . ., the manifest attitude of the police toward him, his physical and mental state, [and] the diverse pressures which sap or sustain his powers of resistance or self-control." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). The government has the burden of proving that the statement was voluntary by a preponderance of the evidence. *Connelly*, 479 U.S. at 168.

Here, the totality of the circumstances indicate that Debevec's statements during his polygraph and post-polygraph interview were made voluntarily. Debevec argues that his statements were involuntary due to "a combination of coercive police tactics and Debevec's physical and mental condition." Docket 61 at 3. Debevec asserts that law enforcement exploited his known physical and mental infirmities by (1) interrogating him for about five hours; (2) engaging in "combative" behavior towards Debevec during the polygraph examination; and (3) administering the polygraph with "ill-defined" questions. *Id.* at 4-6.

18

As an initial matter, the magistrate judge was correct in concluding that Debevec's physical and mental state is relevant in analyzing whether his confession was coerced. *See Spring*, 479 U.S. at 574 (explaining that a defendant's physical and mental state is relevant to the inquiry as to what constitutes coercion). Debevec told the agents that he had not eaten since the previous morning, was running on two-three hours of sleep from the night before, endured back pain, had a history of heart problems, and was prescribed certain medications for neuropathy, anxiety, and ulcers.

Debevec argues that the agents exploited these physical and mental "weaknesses" by being "combative" and asking "ill-defined" questions while interrogating him for five hours. *See* Docket 61 at 4-6. But instead of exploiting these infirmities, law enforcement ensured that Debevec's statements were voluntary by advising him of his *Miranda* rights—twice—and asking whether he understood his rights, whether he understood the questions he was asked, and whether he knew why he was being interrogated. *See Williams v. Norris*, 576 F.3d 850, 868 (8th Cir. 2009) ("[I]t is a rare case when a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda*.") (internal quotation marks omitted).

Far from exploiting Debevec's physical and mental state, the agents provided Debevec with water, bathroom breaks, and opportunities to stand and stretch throughout the questioning. The record is also

devoid of any evidence that Debevec was under the influence of his prescription medication. Even if Debevec was under the influence of his medication, there was no evidence that his medication restricted his capacity to understand and respond aptly during the polygraph or post-polygraph interview. Debevec was engaged when asked questions and he never indicated that he could not answer a question or that he did not know what was happening.

Debevec stated at the end of the post-polygraph interview that, if he had to take another polygraph, he would be okay with SA Johnson as the polygrapher. Debevec repeatedly denied that his intention was to have sex with Zoee or that he had sexual contact with any minors in the past. Debevec's denials show that his physical and mental state was not exploited and his will was not overborne. *See United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008) (noting courts must consider the defendant's capacity to resist pressure). Debevec's denials stand in contrast to his admission that he intended to have sex with Zoee the day he was supposed to meet her at Cherry Rock Park. These factors all indicate Debevec's confession was voluntary.

In addition, the type of pressure the agents used in conjunction with their knowledge of Debevec's physical and mental state does not render his confession involuntary. Debevec was subject to interrogation for nearly five hours. But that duration, standing alone, is not the sort of continuous duration that has been deemed coercive. *See, e.g., Ashcraft v. Tennessee*, 322

20

U.S. 143, 153-54 (1944) (defendant interrogated by relays of officers, investigators, and lawyers without respite for thirty-six hours); *Fikes v. Alabama*, 352 U.S. 191, 197 (1957) (defendant "questioned for several hours at a time over the course of five days" while being held in isolation); *Reck v. Pate*, 367 U.S. 433, 441 (1961) (defendant held incommunicado for nearly eight days and was subjected to six- or seven-hour stretches of relentless interrogation each day); *Payne v. Arkansas*, 356 U.S. 560, 564, 567 (1958) (defendant questioned for an "extended time" and held incommunicado for three days with little food).

Moreover, Debevec was not held incommunicado, as he was allowed to call his wife before the polygraph—something SA Johnson admitted was not his common practice. *But cf. Blackburn v. Alabama*, 361 U.S. 199, 207-08 (1960) (police exploited defendant's mental infirmities by holding defendant incommunicado for eight to nine hours with sustained interrogation). Although Debevec had not eaten since the previous morning, there is no evidence indicating that the agents deprived Debevec of food to elicit a confession.

It is true that Debevec showed signs of drowsiness and, at one point, told SA Johnson he was doing all he could to stay awake after only sleeping about two hours the night before. But the record does not reveal that police exploited Debevec's lack of sleep to elicit a confession. Debevec never once told police that he was too tired to continue the polygraph. Even if Debevec tried to rest his eyes between the polygraph and post-polygraph interview—which is uncertain—there is no evidence the police knew this, let alone exploited it.

During the post-polygraph interview, Debevec appeared engaged in his discussion with SA Johnson. At no time did Debevec provide unresponsive or nonsensical answers. Merely because Debevec was interviewed by law enforcement when he had little to eat and limited sleep does not render his confession involuntary. *See United States v. Petary*, 857 F.2d 458, 461 (8th Cir. 1988) (finding statements voluntary, even though defendant "had not slept for approximately twenty-four hours and had consumed beer but no food"). The key question is whether law enforcement coerced Debevec's confession by exploiting the fact that he had not eaten or slept. Nothing in the record suggests that was the case.

Debevec also alleges that SA Johnson coerced him into confessing by essentially using combative tactics and exploiting the pain Debevec felt from the cardio cuff being too tight. Docket 61 at 5. Although SA Johnson's attitude was indelicate and perhaps undiplomatic at times, "tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993). Debevec did state his concern about the cuff to SA Johnson and SA Johnson told Debevec to suck it up for a short while when it appeared the cardio cuff was causing Debevec pain. But SA Johnson's conduct was more brusque than combative. Certainly, coercion can encapsulate more than swearing, yelling, or touching, but nothing SA Johnson

did during the polygraph examination rose to the level of "combative."[6] Even if SA Johnson was "combative," the use of this tactic alone does not transform Debevec's confession into an involuntary one—the overall impact of the interrogation must have caused Debevec's will to be overborne. The totality of the circumstances indicate that is not what happened here.

Irrespective of his attitude, Debevec could have taken the cuff off because it was his right to end the polygraph examination at any time. In fact, Debevec confirmed his understanding of this right by asking SA Johnson, just prior to starting the polygraph, whether he could stop the test at any time. SA Johnson replied, "absolutely." Even after Debevec voiced his concerns about the cuff, SA Johnson asked Debevec if he wanted to continue the polygraph. Instead of stopping, Debevec requested a short break, which SA Johnson granted.

The polygrapher's "ill-defined" questions likewise do not render Debevec's confession involuntary. Debevec claims that SA Johnson "never provided a clear definition of what he meant by 'minor' prior to administering the polygraph." Docket 61 at 6. Debevec also claims that by telling Debevec most states "say sixteen is the age of consent," Johnson confused Debevec by then discussing "age-appropriate relationships" like eighteen- and nineteen-year-olds dating sixteen-year-olds. *Id.* According to Debevec, this was yet another

---

[6] The Oxford Learner's Dictionary defines "combative" as "ready and willing to fight or argue." *Combative*, OXFORD LEARNER'S DICTIONARY, https://www.oxfordlearnersdictionaries.com/us/definition/english/combative ?q=combative (last visited Aug. 9, 2024). SA Johnson even told Debevec at one time that he was not going to argue with him about the examination, further suggesting SA Johnson was not combative. *See* Ex. 2 at 20:46:25.

coercive measure used by law enforcement that pressured him into confessing. Indeed, it seems that at one point during the post-polygraph interview Debevec was confused about whether a "minor" in this context was someone under the age of eighteen or under the age of sixteen. But even if Debevec was confused at that time, SA Johnson subsequently made it sufficiently clear, before Debevec confessed, that he was only concerned about sexual relationships with someone under sixteen years old.[7] The court thus agrees with the magistrate judge that SA Johnson was sufficiently clear that when he asked Debevec about whether he had ever had sexual contact with a "minor," SA Johnson meant someone under the age of sixteen.

Debevec knew his rights and understood the consequences of committing the crime for which he was arrested. He was questioned for about five hours and was not mistreated. The record is devoid of any tactic used by police that exploited Debevec's use of medication, lack of food, or lack of sleep. The purpose of interrogation tactics is to extract a response, and the fact that the tactics used here by SA Johnson yielded the intended result does not render

---

[7] After the polygraph, SA Johnson told Debevec that he failed the polygraph "because [Debevec] had sexual contact with a child." Debevec responded by explaining that his Pizza Hut co-worker was not eighteen; she was sixteen. This implies that Debevec understood "minor" to mean someone under the age of eighteen. SA Johnson, however, then explained that sixteen is the age of consent and those are not the relationships he was concerned with. SA Johnson then asked whether the co-worker was under the age of sixteen. Debevec said no, she was not. This conversation makes it clear that when SA Johnson asks about sexual relationships with a "minor," he meant someone under the age of sixteen. Debevec's confession came after this exchange, meaning that the definition of a "minor" was sufficiently clear at the time of his confession.

Debevec's confession involuntary. Based on the totality of the circumstances, nothing in the record indicates that Debevec's statements were extracted by threats, violence, or promises (express or implied) that overbore his will and critically impaired his capacity for self-determination. Debevec's objection is overruled.

### 2. Whether the search warrant for Debevec's cell phone was legally sufficient

Debevec next objects to the magistrate judge's finding that the search warrant issued was sufficiently particular. Docket 61 at 7-8. Law enforcement searched Debevec's Motorola phone with the phone number of 307-258-1086 and a passcode of 1995 under a valid search warrant signed by Magistrate Judge Moreno. Debevec argues that because the search warrant granted a search of Debevec's "*Samsung* phone with the phone number of 307-258-1086, with pass code of 1995[,]" the phone searched was not particularly described in the warrant and therefore violated Debevec's Fourth Amendment right to be free from unreasonable searches and seizures. Docket 43 at 11 (emphasis added). Debevec also contends that "Attachment B to the warrant referenced a different person, Kent Mews, as opposed to Jayden Debevec. As such, law enforcement conducted a warrantless search of Debevec's Motorola cell phone." *Id.* The issue here is whether the mistaken description of the phone invalidates the search.

The Fourth Amendment of the United States Constitution requires, in pertinent part, a search warrant to "particularly describ[e] the place to be searched." U.S. CONST. amend. IV. The purpose of the particularity requirement

is to prevent officers from performing "a general, exploratory rummaging of a person's belongings." *United States v. Saunders*, 957 F.2d 1488, 1491 (8th Cir. 1992) (internal quotation marks omitted). "The requirement is one of practical accuracy rather than a hypertechnical one." *United States v. Ivey*, 91 F.4th 915, 918 (8th Cir. 2024) (internal quotation marks omitted). "In assessing whether a warrant is sufficiently particular, [the court] consider[s] the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Id.* "Although 'courts must proceed cautiously whenever an error, no matter how seemingly insignificant, appears within the four corners of a warrant,' warrants containing an 'unintentional drafting oversight are not always invalid.' " *United States v. Abdalla*, 972 F.3d 838, 848 (6th Cir. 2020) (quoting *United States v. Watson*, 498 F.3d 429, 434 (6th Cir. 2007) (cleaned up).

The magistrate judge correctly determined that the search warrant was sufficiently particular. *See* Docket 55 at 46-47. The warrant incorporated Attachment A, which specifically described the phone to be searched as Jayden Debevec's phone. *See* Ex. 16 at 4. Attachment A also correctly listed the phone number of the phone to be searched and its passcode. *Id.* It is also significant that the "test" message from Zoee—sent immediately after Debevec's arrest— was received and displayed on the phone that was seized from Debevec at Cherry Rock Park. This confirms that the device seized from Debevec was the same phone number and device that was used to text with Zoee.

There was additionally a very high probability that the correct phone was

26

searched. There was only one phone seized in this case. Once Debevec's phone was seized, it was set to airplane mode, placed into an evidence bag, and labeled with a case file (tracking) number. SA Hauck testified that he removed the phone from the labeled bag and extracted the relevant contents from the phone. This signifies that the chances of the wrong phone being searched were slim-to-none. Debevec argues that the phone number and the passcode "could not be ascertained by law enforcement until a search of a phone was already underway" and therefore "there was a risk that law enforcement could have searched the wrong phone." Docket 61 at 7-8. This argument, however, neglects to consider that law enforcement already verified that Debevec's phone—seized during his arrest and placed in an evidence bag on site—was the one with the phone number that was texting with Zoee. That same phone was then pulled from the evidence bag and searched by law enforcement according to the warrant. Presumably the passcode had to be entered, further aligning the details of the search warrant with the phone searched and confirming the phone was Debevec's.[8]

Debevec argues that because his phone is a "Motorola" and the warrant mistakenly allowed for the search of a "Samsung" phone, the search was invalid. *See* Docket 61 at 7-8. But this argument fails because it is premised on the assumption that the particularity requirement under the Fourth

---

[8] Although SA Hauck testified that he could not recall whether he entered the passcode to Debevec's phone before extracting its contents, he stated that, in general, he must enter the phone's passcode to conduct step one of the data extraction process. *See* Docket 58 at 83.

Amendment requires a hypertechnical analysis. The mistake in the warrant—indeed sloppy as the magistrate judge noted—does not invalidate the search warrant. The warrant specified Debevec's phone as the one to be searched—including the correct phone number and passcode—and identified the information to be seized. And the evidence strongly suggests that the phone seized from Debevec at the time of his arrest was the phone searched by law enforcement. Even though the description in the search warrant contained an erroneous description of a "Samsung" phone, the error was unintentional. *See Watson*, 498 F.3d at 433 (holding that a reviewing judge's error in overlooking an address in a warrant did not justify suppression because the rest of the warrant sufficiently described the property). These circumstances indicate that the search warrant was sufficiently particular and thus valid.[9] Debevec's objection is overruled.

### 3. Whether the *Leon* good faith exception applies to law enforcement's search of Debevec's cell phone

Debevec also argues that the good-faith exception to the exclusionary rule cannot apply because it was unreasonable for law enforcement to rely on a warrant lacking in particularity. Docket 54 at 1-3. But "the exclusionary rule does not apply when the police conduct a search in 'objectively reasonable

---

[9] Debevec's argument that the search warrant is also invalid because it references a wholly different person—Kent Mews—also misses the mark. As the magistrate judge noted, "[t]he reference to Kent Mews in Attachment B was irrelevant to the search warrant. This provision gave permission to officers to use biometrics to open the phone if necessary. Because officers had the passcode to Mr. Debevec's phone there would have never been a need to resort to the use of biometrics to access the phone's contents." Docket 55 at 47 n.11.

reliance' on a warrant later held invalid." *Davis v. United States*, 564 U.S. 229, 238-39 (2011) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). Because the warrant here was not lacking in particularity, it was reasonable for SA Hauck to rely on the warrant as he extracted the contents from Debevec's phone. *See Leon*, 468 U.S. at 921 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.").

Even if the search warrant had been invalid, it still would have been reasonable for law enforcement to rely on it based on the totality of the circumstances. *See United States v. Simpkins*, 914 F.2d 1054, 1057 (8th Cir. 1990) ("When assessing the objective good faith of police officers executing a warrant, we must look to the totality of the circumstances.") (internal quotation marks omitted). At the time of Debevec's arrest, law enforcement took custody of his phone that was found in his Jeep. Almost immediately thereafter, they confirmed—through a "test" message—that Debevec's phone was the one used to message Zoee. That phone was bagged and taken into custody. Debevec then verified during his interrogation with law enforcement that the phone confiscated during his arrest was used to message Zoee.

Further, as the magistrate judge recognized, the information known to law enforcement as the warrant was executed demonstrates objective good faith reliance on the search warrant's validity. *See* Docket 55 at 48. The warrant and its attachments described a phone with the correct owner, phone number, and passcode. SA Jacob, who executed the search of the phone's

29

data, was provided with an external drive containing the extracted information from Debevec's phone. SA Jacob neither seized the phone from Debevec's Jeep nor extracted the phone's contents with the Graykey tool. SA Jacob was told that the external drive's contents came from Debevec's phone. SA Jacob then applied the date filters according to the warrant and examined the results. Based on the totality of the circumstances, SA Jacob reasonably believed that he had authority to search the data provided to him from Debevec's phone. Debevec's objection is overruled.

### 4. Whether law enforcement's search of Debevec's cell phone complied with the scope of the warrant

Lastly, Debevec contends that the government's search of his phone exceeded the scope of the search authorized by the search warrant. Docket 61 at 8-9; Docket 54 at 3-5. The warrant here specifically permitted the search and seizure of information on the phone from January 1, 2023, to the present (at that time that was March 15, 2023) that was pertinent to the crime of attempted enticement of a minor using the internet. Ex. 16 at 5. Debevec alleges that, by downloading all the phone's contents instead of limiting the download to the date restriction in the warrant, the fruits of the search of his phone should be suppressed. *See* Docket 61 at 8-9. The court rejects this argument.

When searching officers follow the commands of a search warrant as to the places to be searched but unlawfully seize items not authorized under the warrant, the unlawfully seized items must be suppressed, but the lawfully seized evidence need not be excluded. *Waller v. Georgia*, 467 U.S. 39, 43 n.3

(1984); *United States v. Decker*, 956 F.2d 773, 779 (8th Cir. 1992). An exception to this rule applies when officers show a "flagrant disregard for the limitations of the search warrant [that] might make an otherwise valid search an impermissible general search and thus require the suppression or return of all the evidence seized during the search." *Decker*, 956 F.2d at 779 (quoting *United States v. Marvin*, 732 F.2d 669, 674-75 (8th Cir. 1984)).

Debevec is correct when he states that law enforcement seized the entire contents of the phone by downloading all its data. While law enforcement seized Debevec's phone and its entire contents at the time of Debevec's arrest, there was no evidence discovered by the government from outside the date restrictions that was specified in the warrant. Thus, there is no evidence to suppress. Even if data from outside the date restrictions were searched, the remedy is suppression of that data—not the wholesale suppression of all data acquired under the warrant. *See Decker*, 956 F.2d at 778.

The flagrant disregard standard also does not apply here. "The Supreme Court . . . has expressly dictated that the flagrant disregard standard applies only where the government exceeds the scope of the authorized search in terms of the places searched, and not to cases in which the government indulges in excessive seizures." *Id.* at 779. Although police access to the entirety of Debevec's phone data here equates to an excessive seizure, the mere incidental access to the information outside the scope of the warrant, by itself, does not

require suppression.[10] SA Jacob's testimony reveals that he did not exceed the scope of the warrant and instead applied the date filter in Cellebrite accurately. Thus, because the warrant specifically provided date limits applying to the search of Debevec's phone—and law enforcement honored those limits when conducting its search—the application of the flagrant disregard standard is precluded.

Debevec next argues that the data extraction process used by HSI transforms the entire search of the data from Debevec's phone into an unreasonable one, and therefore, "all the data should be suppressed." Docket 61 at 8-9; *see* Docket 54 at 4-5. But, as the magistrate judge observed, while HSI's process for searching cell phones can certainly be improved, the process used in Debevec's case did not violate his Fourth Amendment rights.[11]

HSI's process when searching an electronic device consists of three steps: (1) extraction of all contents on the device using Graykey; (2) transfer of those contents to an external drive using the Cellebrite software; and (3) search of those contents using date filters available on Cellebrite. Here, SA Hauck performed steps one and two while SA Jacob performed step three. According to testimony at the hearing, Graykey does not allow for a partial extraction of data from an electronic device. Presumably, then, overinclusion of data at step

---

[10] Even so, the government asserted at the suppression hearing that there was no evidence from Debevec's phone gathered outside the date range specified in the search warrant.

[11] The magistrate judge details in her Report and Recommendation a procedure that HSI can use to search cellular phone data that more closely adheres to the Fourth Amendment. *See* Docket 55 at 50-51. The court agrees with the magistrate judge's policy recommendation.

one is unavoidable. Debevec's contention that all fruit acquired from the search should be suppressed is thus misplaced. As previously discussed, law enforcement did not search any data that was outside the scope of the warrant. Mere overinclusion of data at step one does not render the entire search unreasonable. Debevec's objection is overruled.

## III.   CONCLUSION

The court adopts the magistrate judge's recommendation as modified and denies Debevec's motion to suppress. Debevec's statements were voluntary and not the product of an overborne will, the search warrant sufficiently described the place to be searched, and law enforcement did not exceed the scope of the warrant when searching Debevec's phone. The court sustains all of Debevec's factual objections and overrules all of Debevec's legal objections. Thus, it is

ORDERED that the Report and Recommendation (Docket 55) denying Debevec's motion to suppress is adopted as modified by this opinion. The motion to suppress (Docket 42) is denied.

Dated September 3, 2024.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE